The Honorable Judge Benjamin H. Settle

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR14-5539BHS |
| Plaintiff, | |
| v. | GOVERNMENT'S SENTENCING MEMORANDUM |
| KAREN WRIGHT, | |
| Defendant. | |

The United States of America, by and through Annette L. Hayes, United States Attorney for the Western District of Washington, and Assistant United States Attorneys David Reese Jennings and Gregory A. Gruber, hereby file this sentencing memorandum in the case against KAREN WRIGHT.  As is explained and supported in detail below, the United States seeks a sentence of eight (8) months of imprisonment, restitution in the amount of $82,000.00, and special terms and conditions of supervision upon defendant's release from custody.

## I.      Introduction

Darryl Wright led a scheme in which he, his sister KAREN WRIGHT, and others schemed to defraud benefits, accommodations, and other things of value from any federal and/or state agency or department that might offer anything to a wounded veteran. Darryl Wright pretended to be severely disabled, primarily from an alleged rocket attack

1  during the Iraq War.  Over the years, Darryl Wright expanded and embellished upon his

2  foundational lies, fabricated documents, and made multiple false statements.  He grossly

3  exaggerated the original rocket event, made up injuries he supposedly sustained, and

4  exaggerated the symptoms he supposedly suffered from the fake injuries.  KAREN

5  WRIGHT, Darryl's sister, played along in exaggerating Darryl's symptoms, mostly by

6  pretending to be his live-in, 7-day-a-week, in-home caregiver at Darryl's home.  Darryl's

7  mother joined the scheme, posing as an objective, neutral, third-party medical

8  professional, and by submitting (as Elaine Spalding, R.N.) exaggerated and false medical

9  assessments about Darryl – all without disclosing that she was in fact his mother.

10  Darryl's father and some of Darryl's friends joined too, assisting by signing exaggerated

11  and false statements about Darryl's symptoms.  In other instances, Darryl stole the

12  identities of friends, acquaintances, and others, using their names and positions in

13  documents that Darryl fabricated for the scheme.  Darryl later enlisted his live-in

14  girlfriend, Heather Munden, to help with the scheme, and to frustrate the efforts of others

15  who tried to stop him.

16       Most of Darryl Wright's fraud in this aggressive scheme rested on fictitious

17  injuries he claimed to have suffered during a rocket attack.  Testimony at the trial of

18  KAREN WRIGHT established that Darryl Wright falsely described the events of the

19  attack, falsely claimed to have been thrown to the ground and seriously injured, and that

20  he wrote and submitted false statements to the Army.  Indeed, witness Bradly Aune

21  testified how Darryl Wright stole his (Aune's) identity and that of another officer, using

22  their names in support of false accounts of the attack.  The evidence showed that Darryl

23  Wright lied to obtain a Combat Action Badge, which he later used to fraudulently obtain

24  a Purple Heart.  As part of his scheme, Darryl Wright built an entire myth system on

25  these two awards, relying on them to obtain every possible benefit that might be available

26  to a wounded veteran.

27

28

GOVERNMENT'S SENTENCING MEMORANDUM
KAREN WRIGHT/CR14-5539BHS - 2

1   Darryl Wright pled guilty to two felony counts of the scheme charged in the

2   Superseding Indictment.  KAREN WRIGHT proceeded to trial.  The jury was unable to

3   reach a verdict, but KAREN WRIGHT plead guilty to making a false statement, in

4   violation of Title 18, United States Code, Section 1018.  Though defendant KAREN

5   WRIGHT pled guilty to a single act of making a false statement, all the conduct and

6   evidence at trial should be considered when weighing Ms. Wright's conduct, when

7   applying the Sentencing Guidelines, and when considering the sentencing factors set out

8   in 18 U.S.C. 3553.

9   Though the trial of KAREN WRIGHT resulted in a hung jury, the evidence firmly

10  established several facts: 1) Darryl Wright created and carried out an outrageous scheme;

11  and 2) KAREN WRIGHT participated in that part of the scheme that involved the VA's

12  Caregiver Program.  Darryl Wright pled guilty to a specific count involving the VA

13  Caregiver Program.  A copy of his Plea Agreement is attached as Exhibit 1.  Darryl

14  Wright specifically admitted to scheming with his sister and outlined her role in the

15  scheme.  Despite affirming these statements, KAREN WRIGHT proceeded to trial and

16  argued the opposite.  Indeed, she testified under oath to things directly contrary to the

17  facts in her brother's Plea Agreement.  In fact, she testified in ways that were contrary to

18  the facts in her own plea agreement.  Her testimony was shaky, inconsistent, combative,

19  often incomprehensible, and consistently beyond belief.  Plainly, KAREN WRIGHT

20  perjured herself, repeatedly

21  **Offense Conduct**--¶

22  KAREN WRIGHT's PSR is spartan compared to the detailed information

23  presented at her trial.  Unfortunately, there is no way that a Probation Officer, no matter

24  how practiced, can possibly include everything that happened during trial, even when

25  transcripts are available.  Accordingly, the United States offers the additional facts below,

26  if only to refresh the court's memory and perspective of what happened during trial.

27  The evidence showed that in February 2010, Darryl Lee Wright used his VA

28  disability records, which portrayed him as a severely wounded combat veteran, to apply

GOVERNMENT'S SENTENCING MEMORANDUM
KAREN WRIGHT/CR14-5539BHS - 3

1   for Social Security Insurance disability benefits. He claimed he was so severely

2   physically and mentally disabled from his combat injuries that he was "unemployable."

3   He was subsequently approved to receive SSI disability benefits, despite the fact that at

4   the time he was fully employed with the U.S. Department of Commerce and employed

5   part-time with the Washington National Guard.  Darryl Wright later used his SSI

6   disability determination to qualify for an early retirement from the U.S. Department of

7   Commerce.  He then applied for State unemployment benefits, alleging that he was

8   willing and able to work despite his multiple disability findings. He then began filling out

9   and submitting fictitious job search logs, which were a required part of the

10  unemployment benefit system. The defendant additionally applied for food stamps,

11  medical benefits, and child care assistance, which were not approved.

12       The evidence presented at trial showed that, in truth, Darryl Wright functioned at

13  an extremely high level, with no sign of disability.  Witness after witness testified at trial

14  about Darryl Wright's abilities and achievements, all of which were radically different

15  from what Darryl Wright and KAREN WRIGHT told the VA, Social Security

16  Administration, and Darryl's  employers.  Darryl Wright openly displayed his

17  achievements and true abilities to his family, friends, and girlfriends.  Although KAREN

18  WRIGHT repeatedly denied knowing about his abilities, and though she battled not to

19  admit much of anything on cross-examination, she ultimately volunteered under oath that

20  she had always been aware of the extent of Darryl's outside activities.

21       **Caregiver Fraud**

22       In May 2011, KAREN WRIGHT applied to the VA to become her brother's full-

23  time, in-home caregiver.  The VA had recently rolled out a new benefit program called

24  the VA Caregiver Support Program.  As part of the application process, Darryl Wright

25  fraudulently claimed that he was so disabled by physical and psychological disabilities

26  that he required full-time, in-home care, 24 hours a day, and seven days a week.  He

27  claimed that he suffered from post-traumatic stress disorder, traumatic brain injury,

28  memory loss, disorientation, depression, anxiety, and occupational and social

GOVERNMENT'S SENTENCING MEMORANDUM
KAREN WRIGHT/CR14-5539BHS - 4

impairment. He claimed he was a persistent danger of hurting himself and/or others. He claimed that he spent two-to-five days a week in a fetal position, only went outside a few times a week, was unable to take public transportation or be in crowds, rarely drove, had a limited attention span, and was unable to follow spoken instructions. He also claimed that he suffered from numerous physical disabilities, and he was unable to function without his sister's assistance. There is no question that Darryl Wright committed fraud to get his sister enrolled in the Caregiver Program.  Indeed, KAREN WRIGHT's lawyer argued that Darryl had committed fraud, but KAREN WRIGHT was unaware he had done so.

Though the first caregiver application to the VA indicated that  KAREN WRIGHT was Darryl Wright's current in-home caregiver, KAREN WRIGHT testified that she did little more than drop by her brother's house in the mornings a few times a week. KAREN WRIGHT admitted on the witness stand that she was not providing care as a caregiver at this time.  We learned at trial that one of KAREN WRIGHT's daughters was in the morning session of a nearby preschool.  (There was no description of how she managed to pay for preschool, and the tuition was not mentioned in her state assistance application.)

We also learned at trial from KAREN WRIGHT that Darryl told her to put the first application on hold because Darryl was in the middle of a custody battle.  KAREN WRIGHT refused, however, to answer any questions about the significance of this, and further refused to admit that she was disappointed and could have used the money.  The evidence at trial showed that KAREN and her family were relying on Public Assistance at the time, and she and her family certainly could have used the money. After the concerns about the custody battle were over, Darryl submitted a second application. KAREN WRIGHT completed a second application as well.  In reliance on the representations of both Darryl and KAREN WRIGHT, the VA approved KAREN WRIGHT's application to be Darryl's in-home caregiver.  What's more, based on the representations of both defendants, the VA agreed to pay KAREN WRIGHT to provide

GOVERNMENT'S SENTENCING MEMORANDUM
KAREN WRIGHT/CR14-5539BHS - 5

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

the highest possible level of care recognized by the VA.  Despite what the defendants told the VA, KAREN WRIGHT was not providing care, and Darryl Wright had no caregiver. He led a very full and active lifestyle that was completely at odds with his alleged disabilities and limitations. He worked as an Economic Development Specialist for the United States Department of Commerce, served as the Snoqualmie City Planning Commission chairperson, served as a hospital foundation board member, served as a community emergency response team member, served as a Snoqualmie Rotary member, served as the campaign manager and door-to-door campaigner for his girlfriend's successful run for a city council position, served as an assistant varsity high school basketball coach, played in a recreational basketball league, was an active TPC Snoqualmie Ridge Country Club sport member, and went on numerous trips and vacations with his friends, girlfriend, and daughter. By all accounts he appeared to be a perfectly healthy and active member of his community.

KAREN WRIGHT testified about the training she underwent to qualify for the Caregiver Program.  She even introduced the Caregiver workbook into evidence.  Though she testified to taking her role seriously, she seemed completely unaware of any of the substance in the book.  KAREN WRIGHT then went through a series of phone calls, procedures, and meetings with VA personnel.  She received letters from the VA that outlined and explained her participation in the program.  The letters explained that she was being paid for providing 40 hours of care per week.  Nonetheless, KAREN WRIGHT testified that she never, not once, thought she was expected to provide care at such a rate. Other evidence, including statements she made in bank records and in her Public Assistance file, indicated that KAREN WRIGHT was fully aware of the 40 hours per week expectation.

KAREN WRIGHT submitted direct-deposit information to the VA so they could deposit the Caregiver payments she expected to receive.  The VA then took additional steps to ensure that Darryl Wright got the care he needed, and that KAREN WRIGHT, as caregiver, did no harm to herself, her own family, or to Darryl.  First, the VA sent out a

1    nurse to evaluate the patient, the patient's home, and the Caregiver.  During this first

2    visit, the VA nurse visited with KAREN WRIGHT and interviewed, questioned, and

3    visually examined Darryl Wright.  The purpose of the visit was to determine KAREN

4    WRIGHT's abilities to meet Darryl Wright's very significant (but falsely inflated) needs.

5    This required that the VA nurse question KAREN WRIGHT about her ability to provide

6    the care Darryl supposedly needed.  The records from these meetings, which became part

7    of Darryl Wright's medical file, showed that both Darryl and KAREN, sitting together,

8    repeatedly, consistently, almost pathologically supplied false information to the VA.

9    Specifically, in the presence of KAREN WRIGHT, Darryl Wright exaggerated his

10   physical symptoms, his mental disabilities, and misled the visiting VA professionals into

11   believing that Darryl Wright was severely disabled—though both Darryl and KAREN

12   knew that none of it was true.

13          For their part, and to evaluate and ensure that VA expectations were being met,

14   VA nurses and mental health professionals visited KAREN WRIGHT in Darryl's home

15   on seven occasions, over a two-year period.  The evidence showed that KAREN

16   WRIGHT made it extremely difficult to schedule the in-home visits.  Twice the VA had

17   to send letters threatening termination of the program to get KAREN WRIGHT to

18   respond and to schedule the required interviews.   The nurses asked questions to and

19   about both Darryl Wright and KAREN WRIGHT.  KAREN WRIGHT participated in all

20   of these face-to-face meetings with VA personnel, beginning in May 2012, with the last

21   in November 2014.  The observations and information collected during the visits were

22   reduced to medical records that became part of Darryl Wright's VA medical file.

23          The evidence at trial showed that, despite face-to-face meetings over a two year

24   period, neither KAREN WRIGHT nor Darryl Wright ever truthfully conveyed Darryl

25   Wright's true condition or capabilities.  At trial, KAREN WRIGHT blamed that failure

26   on the VA, on her brother, and on her failure to understand or properly respond to

27   questions, and on various other things.  She denied that certain incriminating responses,

28   attributed to her and contained in the medical records, were ever asked of her.  KAREN

GOVERNMENT'S SENTENCING MEMORANDUM
KAREN WRIGHT/CR14-5539BHS - 7

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   WRIGHT admitted that her care consisted of going to Darryl's house when her oldest

2   daughter was in a nearby preschool—on Monday, Wednesday and Friday.  She would

3   arrive at her brother's house at 9:30, with her youngest daughter, and would leave by

4   12:30 to pick up her other daughter at school.  She was permitted full use of the house

5   and given a key.  She would check on her brother, but described very little else in the way

6   of actually providing him with care. She never met with doctors, never spoke with

7   doctors, was unfamiliar with Darryl's medical records or complaints, never drove him or

8   accompanied him at medical appointments, and never consulted with or spoke with

9   anyone at the VA about being a caregiver.  She said he had no physical disabilities and no

10  need for a cane.

11          At trial, KAREN WRIGHT took the position that she had no idea Darryl was

12  committing fraud, that she had no idea she was involved in a fraud, that she had no idea

13  what the VA expected of a caregiver, and that she had no idea how or in what way Darryl

14  had described his condition or needs to the VA.  She further claimed she had no idea she

15  was expected to provide fulltime care, and that she never gleaned from the many

16  meetings in Darryl's home that the questions by the nurses and psychologists about

17  Darryl's condition might require her to reveal the truth about Darryl's personal and

18  professional life, particularly his busy calendar of activities.  She claimed that she did not

19  understand things, was not told things, and somehow remained totally unaware of the

20  VA's expectations over the two-and-one-half years she participated in the program.

21          The evidence in the medical records, created by the visiting nurses and mental

22  health professionals and introduced at trial, were all based on in-person interviews with

23  KAREN WRIGHT.  These records were a stark contrast to the know-nothing/see-

24  nothing/hear nothing/say-nothing position that KAREN WRIGHT claimed at trial.  For

25  example, the medical records showed that KAREN claimed she drove Darryl to

26  appointments, that she claimed Darryl needed help walking, needed a cane, needed help

27  getting dressed, needed help transferring, shopping, and with his finances.  KAREN

28  WRIGHT simply dismissed the entries in the medical records, claiming that the nurses or

GOVERNMENT'S SENTENCING MEMORANDUM
KAREN WRIGHT/CR14-5539BHS - 8

1  the psychologist had been careless or mistaken in recording the information.

2  Alternatively, KAREN WRIGHT said Darryl Wright did in fact need those things.  Many

3  times she testified that something was true, but it was not, then it was again. Her answers,

4  just like her brother Darryl's, depended on what would benefit her most in that exact

5  moment.

6       The evidence at trial showed that Darryl Wright was not only fully able to

7  participate in most activities, but also that he was going above and beyond what most

8  people are able to accomplish.  The medical records described a housebound patient with

9  very little energy.  In truth, during the summer of 2013, Darryl Wright had a live-in

10 girlfriend, another girlfriend on the side, spent days "poolside" with his daughter at the

11 Country Club, served as chairman of the planning commission, started a new business,

12 served as campaign manager for his live-in girlfriend's campaign for city council, and

13 even toyed with running for public office himself.  None of these activities were

14 disclosed during the VA in home visits.  The medical records reveal that KAREN

15 WRIGHT and Darryl Wright painted a picture of Darryl as a very disabled individual,

16 with no capability for what in fact was happening in his life.

17      KAREN WRIGHT testified on direct examination that she had no idea about

18 Darryl's activities when she was not present. But she later admitted on cross-examination

19 she was always fully aware of all his outside activities.  When questioned about Darryl's

20 individual accomplishments, KAREN WRIGHT followed what became a familiar

21 routine:  first she denied knowledge; once knowledge was proven, she claimed she was

22 never asked about that specific activity, thing, symptom,  accomplishment, capability, or

23 event; when pressed about things she should have known and revealed, she made

24 statements such as, "I wasn't a helicopter caregiver."  Ultimately, if forced to admit

25 something, such as Darryl Wright's recreational basketball, she claimed they were a

26 product of her caregiving, and a good thing.  Finally, and far too often, she then denied

27 during cross-examination what she had already admitted on direct examination.

28 Sometimes, she spontaneously admitted it once again.

GOVERNMENT'S SENTENCING MEMORANDUM
KAREN WRIGHT/CR14-5539BHS - 9

KAREN WRIGHT was specifically questioned about her November 2014 meeting with Dr. Bambara from the VA.  Though she had earlier introduced on direct examination an email in which she was asking about the propriety of caregiver payment while her brother was in the hospital, she denied doing the same during the face-to-face meeting. She denied that Heather Munden was pregnant during the September 2013 and November 2013 meetings, and insisted this was the case until confronted with the ineluctable math of human gestation.  She denied meeting with Dr. Bambara in 2013 after her husband's accident until shown documents confirming that she had in fact done so.  She claimed she took care of her brother immediately after returning from Europe, then admitted she did not.  When confronted with her failure to honestly inform Dr. Bambara about the events in her life, she claimed Dr. Bambara was not interested in her personal information. (Earlier, however, KAREN WRIGHT testified that she omitted to disclose information about Darryl because Dr. Bambara was only interested in her condition.)

In early 2014, agents made a recorded call of KAREN WRIGHT in which they asked questions about her caregiving services.  The caller represented he was from the VA, and asked questions of KAREN about her participation in the Caregiver Program. Defendant KAREN WRIGHT lied repeatedly in her answers during the call.  She said she worked as a caregiver fulltime, every day of the week for Darryl Wright.  She lied about what she did for him (claiming she drove him places).  Finally, she exaggerated Darryl's mental disability when asked if he might be able to answer the same questions. KAREN WRIGHT stated, "Um, yeah, he's not here right now, but um, yeah, he gets a little mixed up sometimes, so he he'll do it but, you get, you might have to be a little slower with him than with me." At trial, she admitted she lied to the VA representative, but explained that it was "a survey," which somehow made lying to the VA acceptable in her mind.

Agents went to Darryl's house on March 19, 2014, to interview Darryl.  KAREN WRIGHT was not present, but drove up an hour after the agents arrived.  Agent Joe Rogers from Social Security showed her several documents and attempted to question

her. Agents asked KAREN WRIGHT to allow them to finish the interview of Darryl, after which they stepped outside the house to ask questions of KAREN WRIGHT. Darryl yelled to her not to answer questions, but KAREN said she knew her rights and agreed to talk.  (She was not under arrest, nor was she in custody.)  Agents showed her the fabricated invoices in her name, and she denied ever having been paid for them, and even invited the agents to check her bank account.  She indicated she was familiar with an SSA document called a function report.  When asked specifically about her role in the scheme, KAREN WRIGHT began crying, announced she was done, and turned and walked away from the agents.

At trial KAREN WRIGHT said extraordinary things about what happened after the agents left that day.  Again, though reluctant to admit she discussed anything about the visit by agents to her brother's house, she blurted that she had discussed the fabricated invoices with her brother, that he admitted to creating the false invoices, and that he had offered her money.  Even with these admissions, KAREN WRIGHT continued to deny that there was anything out of order or strange about the unfurling events.

**The Plea Agreement**

KAREN WRIGHT pled guilty to the facts in paragraph C of the Statement of Facts in KAREN WRIGHT's Plea Agreement which are contrary to KAREN WRIGHT's testimony at trial.

At trial, when asked about these events, KAREN WRIGHT testified as shown in Exhibit 2.

As if this were not enough, KAREN WRIGHT also testified that she did not sign the affidavit that had her notarized signature. Incredibly, she also denied signing another document, witnessed by Heather Munden, and submitted by Darryl in support of Darryl's efforts to get additional VA disability benefits.  At trial, defense counsel put on an expert to imply that Darryl Wright could have fabricated both documents.  However, when agents showed KAREN WRIGHT the notarized document, with her attorney present, both KAREN WRIGHT and her attorney acknowledged that she had in fact signed it.

GOVERNMENT'S SENTENCING MEMORANDUM
KAREN WRIGHT/CR14-5539BHS - 11

1   Her attorney explained that Darryl drafted it, but KAREN signed it.  KAREN WRIGHT

2   perjured herself when she claimed at trial she did not sign it. In addition, Darryl Wright

3   indicated, after a very careful reading of the fact statement in his plea agreement, that

4   KAREN WRIGHT signed the notarized affidavit that he subsequently submitted to SSA.

5   It appears KAREN WRIGHT perjured herself when she claimed—on direct examination

6   and again on cross-examination—that she did not sign the notarized document.

7          **Sentencing Guidelines**

8          The United States concurs with Probation's calculations of the sentencing

9   guidelines with regard to the addition of points attributable to loss, but will seek to have

10  the court determine the precise amount of loss (since doing so will influence the

11  calculations for codefendant Darryl Wright).  In addition, the United States persists in its

12  objection that KAREN WRIGHT's guideline total should be aggravated for obstruction

13  of justice because of her untruthful testimony.  With the aggravation for obstruction, the

14  guidelines range is 10 to 16 months of imprisonment.

15         The loss amount for the Caregiver Program fraud, which is the category of focus

16  in defendant KAREN WRIGHT's plea agreement, should be the full amount paid to

17  KAREN WRIGHT—$83,967.00.  The determination of loss under the applicable

18  guidelines is governed by Section 2B1.1, Cmt. N.3(F)(ii).  This provision discusses the

19  calculation of loss in government benefits cases.  It states that loss shall be considered to

20  be "not less than the value of the benefits obtained by unintended recipients or diverted to

21  unintended uses …."  The Application Note then provides an example using food stamps,

22  and states the loss would be what the difference between what was  intended and what

23  was fraudulently received.  *Id.*

24         Case law discussing this Application Note supports the idea that fraud in the

25  inducement, or fraud committed in obtaining benefits in the first instance, causes the

26  entire amount of benefits to be counted as loss.  For example, in *United States v. Torlai*,

27  728 F.3d 932, 939-942 (9th Cir. 2013), the Ninth Circuit wrestled with a defendant's

28  claim that the District Court improperly calculated the loss in his government benefits

GOVERNMENT'S SENTENCING MEMORANDUM
KAREN WRIGHT/CR14-5539BHS - 12

1   fraud conviction.  Torlai's case involved government crop insurance.  Defendant Torlai

2   argued that, since he planted and lost some legitimately insured crops, the sentencing

3   court should have reduced the loss calculations by those amounts.  Torlai argued that the

4   district court merely assumed "that he was not entitled to any of the money he received in

5   the form of indemnity payments," with "[n]o attempt [being] made to separate the

6   legitimate from the illegitimate claims for the purpose of determining how much of the

7   insurance claim was fraudulent ... and how much of the claim was not erroneous." *Id*.

8   Torlai argued that the district court erred by not conducting an analysis "to determine

9   how much of [his] claims or intended claims were legitimate (citing the loss calculation

10  under the government benefits provision of § 2B1.1 cmt. n.3(F)(ii)).  Specifically, Torlai

11  argued that notwithstanding the false statements he made to get the insurance, the district

12  court should have been required to determine the amount of the resulting indemnity

13  payment to which Torlai would have been legitimately entitled, under the valid crop

14  insurance policy, had he not made the false statements.

15      The Ninth Circuit rejected Torlai's argument, noting that "[w]e need not address

16  Torlai's argument because it assumes a premise he cannot sustain: that Torlai retained a

17  valid crop insurance policy despite his misrepresentations."  Relying on the principal that

18  the policy would have been invalid had Torlai made any material false statements in the

19  application, the Ninth Circuit concluded that, "if Torlai misrepresented any material fact

20  in his policy application, then his crop insurance policies would be void and the district

21  court could determine that Torlai was not an intended recipient of the government benefit

22  at issue—crop insurance indemnity payments. *Id. at* 940.

23      Although the *Torlai* case involved insurance benefits, the Ninth Circuit's analysis

24  concerning fraud to obtain the benefit, rather than to enhance the benefit, is instructive

25  here.  It is uncontroverted that Darryl Wright committed fraud to get the Caregiver

26  benefits.  He exaggerated his injuries, symptoms, and disabilities.  Indeed, KAREN

27  WRIGHT argued at trial that the fraud was Darryl's, not hers, and that she knew nothing

28  about the false statements Darryl made to qualify for the program.

GOVERNMENT'S SENTENCING MEMORANDUM
KAREN WRIGHT/CR14-5539BHS - 13

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    It is also uncontroverted that Darryl Wright continued to lie about his disabilities

2    and capabilities, stringing the VA along in the same manner he was defrauding his other

3    victims.  He lied every time he met with VA personnel.  He represented that KAREN had

4    been his caregiver.  He made up stories about his need for a cane, his inability to

5    concentrate, and other infirmities.  He concealed the truth about his condition—at least

6    from the VA-- for years.  Darryl Wright was, without question, an unintended recipient of

7    Caregiver benefits.

8    Although KAREN WRIGHT received nearly $84,000 dollars from the VA, Darryl

9    Wright was the conduit for the benefits.  Darryl Wright was the originator of the

10   Caregiver benefits.  But for Darryl Wright's fraud, the VA never would have paid

11   KAREN WRIGHT a dime.  This makes it implausible for KAREN WRIGHT to argue

12   that she is somehow entitled to a reduction in loss because, as she claims, she provided

13   some services.  Darryl Wright was never entitled to Caregiver services.  Witness after

14   witness testified that he had no caregiver and needed no caregiver.  If Darryl Wright was

15   the unintended recipient of Caregiver benefits, then KAREN WRIGHT cannot make a

16   good faith claim against the United States for an offset of proceeds obtained by fraud.

17   Of course, KAREN WRIGHT provided no services of value, and her own

18   testimony established that.  First, KAREN WRIGHT admitted she received thousands of

19   dollars in undeserved money in her first Caregiver payment.  She treated it as found

20   money, refusing to give any reasonable explanation for why she kept the money—even

21   though she admitted she was not providing caregiver services during the time covered by

22   the payment.  Second, KAREN WRIGHT testified that her presence at Darryl's house

23   was a matter of convenience, not service.  She made it clear that she was showing up at

24   Darryl's house when she dropped off her child at daycare, which amounted to (if true) no

25   more than 9 to 10 hours a week.  Third, although she testified for nearly a day, she

26   provided no details about what it was that she was doing.  In fact, she repeatedly denied

27   that she was responsible for the descriptions of care taken down by the visiting nurses

28   and doctors during their visits with her.  She did not drive Darryl places, she attended no

GOVERNMENT'S SENTENCING MEMORANDUM
KAREN WRIGHT/CR14-5539BHS - 14

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   medical appointments, she monitored none of his treatments, she did no housework, and
2   she did no cooking.

3         KAREN WRIGHT is in a dilemma of her own making.  In her efforts to distance
4   herself from the medical records, which reflect that she represented having provided
5   specific kinds of care to her brother Darryl, it is now almost impossible to account for
6   services that she might have actually provided.

7         Finally, there is the crime of conviction itself.  KAREN WRIGHT admitted that
8   she concealed facts from Dr. Bambara during a home visit in 2013.  On the witness stand,
9   however, KAREN WRIGHT claimed she concealed nothing from Dr. Jennifer Bambara.
10  At trial, specifically, KAREN WRIGHT stated, "I have never lied to Jennifer."  When
11  asked,"You have never told her the truth, have you," KAREN WRIGHT testified, "Yes, I
12  have, that's all I did."  Clearly she did not, by her own admission in her Plea Agreement.

13        At the time of sentencing, the United States plans to quickly go through KAREN
14  WRIGHT's testimony to establish how she obstructed justice.  In addition to admitting,
15  denying, and admitting material facts, the United States hopes to establish that KAREN
16  WRIGHT gave false testimony about the following:

17
18      1.  That she never signed the notarized affidavit in her name.

19
20      2.  That she never signed the form witnessed by Heather Munden.

21      3.  That someone at Public Assistance told her to write down 40 hours a week in
22          her Public Assistance application.

23      4.  That her testimony about concealing nothing from Dr. Bambara (or anyone
24          else at VA) is directly contrary to her stipulated facts in her plea agreement.

25  **Conclusion**

26        The weeks of testimony and the many exhibits at trial shed great light on the
27  entire Wright family.  The medical records created by the VA professionals who made
28

GOVERNMENT'S SENTENCING MEMORANDUM
KAREN WRIGHT/CR14-5539BHS - 15

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   home visits show a consistent, lengthy pattern of concealment by both Darryl and

2   KAREN WRIGHT.  KAREN WRIGHT committed a serious offense, and the requested 8

3   month sentence is needed to reflect that--to her and the public.  KAREN WRIGHT's lies

4   during the undercover recorded call, and her incredible casualness about continuing to

5   take money from the Caregiver program after learning that her brother had fabricated

6   documents (and told agents during an interview) that he had been paying KAREN for

7   services all along, demonstrates that she is definitely at risk to reoffend.  There was no

8   remorse in her testimony, only blame for her brother—unless it required specifics.

9        There is a great need here for deterrence.  These cases are difficult to

10  investigate and even more difficult and costly to prove.  (This is the first prosecution of

11  its kind, at least that we know of.)  The government cannot afford to tolerate fraud in any

12  of its benefit programs.  Every dollar lost to fraud is money that fails to go to deserving

13  beneficiaries.  And here, the Caregiver Program is growing quickly, so it is critical to

14  respond to this program fraud with an appropriate sentence in this case.  A sentence of

15  probation, with no time in custody, deters no one from engaging in similar conduct, for

16  the benefits obtained by someone like KAREN WRIGHT would then far outweigh the

17  risks.  If anything, a sentence without custody deters the VA from pursuing these

18  violations, considering the effort and cost required to bring them to trial.

19       There is also a need here  to protect the public from future crimes like this.

20  Though this court sees the good in everyone, it must be said that defendant's testimony

21  demonstrated casualness toward to truth, and toward fraud, that makes it predictable she

22  will take similar risks in the future.

23       Finally, there is also a need for certain special conditions of supervision.

24  First, KAREN WRIGHT should be ordered file amended tax returns.  The money she

25  received was originally tax free; now, however, it is stripped of that characterization, so

26  she must pay taxes on the proceeds she received through fraud.  Second, she should be

27  ordered to participate in moral reconation therapy.  This is consistent with the need to

28  prevent her from committing benefits fraud in the future.  The evidence demonstrated

GOVERNMENT'S SENTENCING MEMORANDUM
KAREN WRIGHT/CR14-5539BHS - 16

there is a need to reconstruct her perspective on truthfulness, particularly when applying for government benefits.  There is a need for speaking the truth and cutting square corners when speaking to government representatives, and when dealing with others in general.  When a person shrugs off lying to a VA employee about her participation in a VA program as justified "because it was a survey," there is something very, very wrong.

DATED this 10th day of August, 2016.

Respectfully submitted,

ANNETTE L. HAYES
United States Attorney

 s/ David Reese Jennings
DAVID REESE JENNINGS
GREGORY A. GRUBER
Assistant United States Attorney
United States Attorney's Office
1201 Pacific Avenue, Suite 700
Tacoma, WA  98402
Telephone:    (253) 428-3817
Fax:             (253) 428-3826
E-mail:  David.R.Jennings@usdoj.gov
E-mail:  Gregory.A.Gruber@usdoj.gov

GOVERNMENT'S SENTENCING MEMORANDUM
KAREN WRIGHT/CR14-5539BHS - 17

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2016, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing

to the attorney of record for the defendant.

*s/Jennifer Shauberger*
JENNIFER SHAUBERGER
Legal Assistant
United States Attorney's Office
1201 Pacific Avenue, Suite 700
Tacoma, Washington 98402
Phone: 253-428-3803
FAX:   253-428-3826
E-mail: Jennifer.Shauberger@usdoj.gov

GOVERNMENT'S SENTENCING MEMORANDUM
KAREN WRIGHT/CR14-5539BHS - 18

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800