UNITED STATES DISTRICT COURT
WESTERN DISCTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff<br>v.<br>KAREN M. WRIGHT, et al.<br>Defendants | NO.  CR 14-5539 BHS<br><br>Karen Wright's Sentencing Memo<br><br>Sentencing Date: 8/17/16 @ 11am |

**Introduction**

Karen Wright joins Probation in asking for a sentence of 3 years' Probation. She further asks for the imposition of $40,000 in restitution.

**Facts**

**1.     Karen Wright Prior to this Case**

We choose not to duplicate the PSR, which does a good job of summarizing Karen Wright's background.  Instead, we highlight a few features.

Family has been a driving force in Ms. Wright's life.  She learned this from her parents, who maintained the family unit as much as possible, even after their divorce.  The importance of family is even more evident today, as Karen Wright is devoted to her husband and daughters.   See Trial Testimony Day 10, p. 4 (her girls

"…the reason I live…"). Her own letter, as well as those of her family and friends, reveals that she is a very good mother, wife, daughter and friend.

In addition to the responsibilities of her family, Ms. Wright helps run a modest family construction business, along with her husband, who does the labor. As her husband Wes notes in his letter, she plays a pivotal role in terms of scheduling, finances, and oversight of the business. Ms. Wright has worked all of her adult life in a variety of jobs where honesty and trustworthiness were paramount, such as her job with the bank prior to the birth of her first daughter.

### 2. Karen Wright and Darryl Wright

The relationship between brother and sister has gone through many ideations over the years. While they were growing up, they fought, with the older brother picking on his younger sister. See KW Trial Testimony, Day 10, p. 5; PSR, para. 31 and 32. But once Darryl went to college in the 1990's, they became close, with Karen visiting Darryl at college and helping him in his student government campaigns. See KW Trial Testimony, Day 10, p. 5-7. This closeness continued into 2004, when Darryl went away to Iraq, which terrified Karen (fearing he would not return alive). Id at p. 7. She recalled one phone call to him while he was in Iraq, where she heard alarms going off which further frightened her about her brother's safety. Id. at 11.

Their relationship changed once again when Darryl returned mid-tour from Iraq to Boise for a pre-planned break in early 2005. Id. at 8-9. During this visit

Darryl was embroiled in legal troubles relating to the break-up of a relationship and his failure to handle it properly. Id. at 7-9. Karen had taken a couple of weeks of vacation time from her job to stay with him in Boise. See KW Trial Testimony, Day 10, p. 7-9. She noticed he had lost weight, was anxiousness, and had a look in his eyes which instinctively told her something was wrong. Id. These were changes in the brother she had not seen before. Id.

Darryl went back to Iraq, but then returned to Boise for good in the Fall of 2005. Karen Wright noticed that her brother was uncharacteristically distant and was drinking a lot. Id. at 13-14 The brother Karen knew as a social and outgoing, was now withdrawn. Id. at 14. Over the next few years, Darryl married, and then divorced, moved in with his mother for roughly one year, and continued in a downward spiral. Id at 14-15. During the year he lived with his mother, he slept a lot and did not interact with family members much, including Karen and her new daughter. See KW Trial Testimony, Day 10, p. 15. Around this time Darryl entered inpatient care for the first time, to deal with his emotional problems. Id. at 15-16.

In roughly 2009, Darryl moved out of his mother's home and lived on his own. Karen Wright occasionally visited him to "keep an eye on him" as he continued to exhibit mental health issues. Id. at 22-23, 115-17, 123. This unofficial oversight continued for the next few years. Id.

Karen Wright became an official VA caregiver in May 2012. In the months preceding her application, she had continued to visit him weekly, to check in on him,

try and get him out of bed, make sure he was taking his medication, etc. Id. at 26, 141, 144, 147. This pattern continued once she was approved as a Caregiver, with her coming over to Darryl Wright's house at least 3 days a week (after dropping off her oldest daughter at school), and as much as 4-5 days, particularly in the summer when her oldest daughter was out of school. See KW Trial Testimony, Day 10, p. 45, 54, 114, 151. During this time, she would arrive around 9:15 a.m. and leave between 12:30pm and 1pm. Id. at 45-46, 52-53. By mid-2014 she was over at Darryl's house 5 days a week during the school year, for a longer period of time. Trial Testimony Day 11, p. 32, 50. Karen Wright felt Darryl needed a caregiver, that she was helping him, and that she was doing what she understood she needed to do as a VA Caregiver. KW Trial Testimony, Day 10, p. 55-56, 146.

During her visits to the home, Karen Wright noticed that Darryl would often be in bed, in a lethargic mood, and she would try and interact with him. Id. at 46, 53. His depression remained steady, while his agitation was getting worse. Id. at 53, 62-63, 67, 72. She testified how hard it was to deal with his mood. See KW Trial Testimony, Day 10, p. 21, 32, 179. She testified that she "spent all my energy on my brother" and would return home with less time/patience with her daughters. Id. at 57. She confided mostly in her dad (Chuck) about the challenges she had in dealing with Darryl. Id. at 56, 92. Chuck Wright was a logical confidante, as he had his own struggles with mental health issues, spent decades working in the state prison system, and noted how his relationship with his son deteriorated so badly that the

two rarely spoke in the years following Iraq. Karen Wright also confided in her husband and "cried on his shoulder." Id. at 57. He wanted her to quit but she remained on because she felt someone needed to watch over her brother. Id. at 57-58, 71, 78.

In the Fall of 2013, Ms. Wright's husband was involved in a serious climbing accident (which he concealed from her while she was on vacation so as to not ruin her trip), only to be followed by a car accident involving both of them 2 days after her return from a vacation with her mother. See KW Trial Testimony, Day 10, p. 68-69. These events brought their business to a halt, debilitated Ms. Wright, and caused family friction as Ms. Wright could not juggle all of the roles she played prior to these incidents. She resumed her duties roughly in November 2013, at the expense of her ability to care for her husband, who was being taken care of by Karen Wright's mother Elaine. Id. at 70-71. This made her feel like an "awful wife" which "caused a lot of friction" between her and her husband, who was "resentful I wasn't taking care of him, and taking care of my brother." Id. at 71.

### 3. The VA Caregiver Program

The trial included ample evidence about the VA's expectations of Karen Wright as a Caregiver (from the Government's perspective), and the lack of instructions/specifics given to her about her role (Defense perspective). Both sides made valid points. The VA witnesses stated that they expected Karen Wright to work 40 hours a week, communicate with the VA about questions she had, etc.

Witness Kris Fredrickson, who was the sole Caregiver Program Coordinator when it launched (there are now roughly 5 persons doing that job in our area), testified that the VA expected far more of Karen Wright. The in-home visits by VA personnel revealed that they expected Karen Wright to be far more forthcoming. Effective cross-examination of her revealed that she did not contact the VA Caregiver Program and inquire about her duties and/or ask for clarification (i.e. "respite"), but easily could have. Id. at 153, 156. She acknowledged making mistakes and looking back found plenty that the VA justifiably criticized her for. Id. at 157.

But the Defense's evidence indicated there were few, if any, specifics given to Karen Wright. Id. at 113. For example, no one ever instructed her on the number of days each week she was required to be there, or the number of hours she was required to work, the significance of the tier level, etc. KW Testimony Day 10, p. 42-47, 63; Day 11, p. 27. True, the tier level that Darryl was approved for (Tier 3), approximated a 40 hour work week, but no one ever told Karen she had to work this number of hours, and her welcome letter specifically stated the "tier level determination does not necessarily equate with hours of care performed." Id. at 42-49, 67, 70, 74-75; Trial Ex. A-15(d). Karen Wright testified that if anyone from the Program had told her she had to work 40 hours a week, she would have not taken the job, as she had quit her bank job in 2007 to be a full-time mother and was not interested in returning to that schedule. Id. at 42, 47, 130-31  Recall that Karen did not pursue this job (it was first offered by Darryl to his father Chuck). Id. at 22.

Further recall that when she initially applied for the VA Caregiver program the year before (2011), and the application lapsed (because of Darryl's concerns about Darla), Karen did not pursue the matter, as she was content to remain a stay-at-home mom. Id. at 123-24. Suffice it to say that when she took the job, she failed to live up to the expectations of the VA and for that, she accepts the blame.

**4.     Plea**

The Government charged Karen Wright with 4 counts involving fraud against the Veterans Administration and the Social Security Administration. The jury spent portions of 3 days deliberating. They could not reach a verdict on any count. This was not a jury impeded by a lone holdout, as illustrated by the questions to the Court from the jury, and the foreman's conclusion that the jury was hopelessly deadlocked. It looked like a jury split down the middle.

Shortly after the trial, the parties resolved the case, with Ms. Wright pleading guilty to a misdemeanor relating to the creation of a false certificate or writing. This conduct involved Karen Wright's failure to apprise Dr. Bambara, during an interview in November 2013, that Karen had not been caring for Darryl for roughly the past 6 weeks, due to her vacation and subsequent car accident. Dr. Bambara prepared a report based on this interview, which indicated that Karen Wright had been providing these services. The plea is consistent with Ms. Wright's trial testimony, when she stated that she provided little or no care to Darryl from early September 2013 to early November, 2013, due to her vacation, and car accident. See KW Trial

Testimony, Day 10, p. 69-70, p. 214-16.  She further testified that during the November 2013 home visit by Dr. Bambara, Ms. Wright failed to apprise Dr. Bambara of this information.  Id. at 218-19; see also Day 11, p. 36.

### 5. The Future

Ms. Wright's future includes a continuation of the overwhelmingly positive parts of her past, including being a devoted wife and mother, and anchor to her family, which extends to her parents and friends.  She plans to continue to raise her daughters, support her husband in his work, and maintain the simple life they enjoy (which at times is paycheck to paycheck).  Perhaps the family home is "somewhat dilapidated" (PSR, para. 36), but it is a loving home.

## Discussion

### I. 3553 factors

The 18 USC 3553 factors warrant a sentence that is sufficient, but no greater than necessary, to punish Mr. Wright.  See 18 USC 3553(a).  We address each factor below.

**(a) the nature and circumstances and of the offense;**

This crime is serious, as it involves the loss of money allotted to an important VA program designed to help veterans remain in their home.  PSR para 9 accurately summarizes the seriousness of this offense.  The program relies on caregivers to fulfill their duties in a manner the VA expects them to.  In this case, Karen Wright failed to do so.

The nature and circumstances of the offense also require us to look at the particular events taking place with the Wright family at the time. Karen Wright had her share of struggles over the years, but nothing prepared her for the double-challenge of her husband's major injury, followed by their motor vehicle accident shortly thereafter in the Fall of 2013. This stress, on top of the ongoing challenges in dealing with Darryl, caused her to make poor decisions; namely, failing to apprise Dr. Bambara of important information that should have been relayed.

**(b) the history and characteristics of the defendant**

Other than this offense, Karen Wright has been a model individual. She has excelled at work, persevered to reach her goal of being a mother, and is a good wife, daughter and sister. She has no criminal history – not even a speeding ticket. The letters from her family and friends reveal that she is a source of support for those who need her. Her life before this case, and now in the present, reveals that she is a good person who made a mistake.

**(c) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, deter criminal conduct, provide just punishment, provide efficient treatment for the defendant, and protect the public;**

Our recommended sentence will address the variety of concerns. It will punish Karen Wright and give her a criminal record; it will require her to pay back money to the VA; and it will serve as a lesson to other caregivers. The public is not endangered by Karen Wright, as she has an otherwise unblemished record, and is no longer working in a position similar to that in this case. The goal is to impose

punishment that is sufficient but no greater than necessary; our proposal accomplishes this goal.

**(d) the kinds of sentences available;**

There is no mandatory minimum sentence in this case. Probation is authorized, because this case involves a misdemeanor. 18 USC 3561. In deciding whether to impose Probation and/or the length of it, this Court is guided by the normal sentencing factors contained in 18 USC 3553. See 18 USC 3562(a). If, rather than Probation, a term of imprisonment is imposed, only one year of supervision is authorized. 18 U.S.C. § 3583(b)(2).

The choice between (a) Probation, and (b) Imprisonment, to be followed by a shorter period of supervision (1 year), reminds us on an issue we have seen in a different context. Often times a defendant seeks to terminate supervision early, after he has done well post-release from prison. In some cases, the defendant owes considerable restitution and this Court has inquired as to how that money will be recouped if the defendant is no longer on supervision. While there are options (civil enforcement), they are far less effective than the continuing oversight of the Probation Department. In our case, by selecting option (a), this Court increases the amount of time Probation will have in monitoring restitution repayments, which seems to best serve the victim in this case (the VA).

**(e) USSG**

At para. 7 of the plea agreement, the parties agreed on the USSG range, as follows:

+6 (base offense level, per USSG 2B1.1(a)(2)
+6 (loss b/w $40k-$95k per USSG 2B1.1(b)(1)(D)
-2 (Acceptance)
…
+10 (range of 6-12 mos, for CH I).

The parties agreed that the above "Total Adjusted Offense Level" placed the Defendant in Zone B of the USSG (Zone B = total offense levels b/w 9-11 points), and allowed the Defendant to seek Probation, while the Government could seek imprisonment. Id. The above calculations left nothing more to add or subtract, otherwise, it would change the "Total Offense Level" of 10 points, and take Ms. Wright out of Zone B. Thus, Ms. Wright seeks no downward departures and her advisory range is 6-12 months.

In the age of Booker, no term of imprisonment is required, and straight probation is authorized. United States v. Gall, 552 U.S. 38 (2007) (district court sentence of probation was reasonable even though advisory USSG range called for prison time). Gall reminded the courts that Probation is a reasonable sentence, when taking into account the individual considerations of each defendant. Prior to the enactment of the USSG in the 1980's, probationary sentences were far more common. See Frank O. Bowman III, The Failure of the Federal Sentencing Guidelines: A Structural Analysis, 105 Colum. L. Rev. 1315, 1328, 1350, n. 65 (2005) (noting 48% of defendants received Probation in 1984, compared to 6.2% in 2007). Gall reminds us that Probation is a sufficient punishment and furthers the goals of 18 USC 3553.

We elaborate on the meaning of "Zone B" in the USSG. Recall that the statute (18 USC 3561) places no conditions on Probation. For example, the statute does not mention an home detention, halfway house placement, etc. as part of the probationary sentence. Simply state, Probation is just that – Probation. The USSG, however, adds conditions for Zone B sentences that the statute does not impose. See USSG 5C1.1(c)(3). These conditions allow the Court to impose Probation, along with such conditions as "substitute intermittent confinement, community confinement, or home detention..." See USSG 5C1.1(c)(3).

These Zone B conditions are suspect for many reasons. First, like the USSG themselves, they are advisory and may be rejected by this Court. See <u>US v. Booker</u>, 543 U.S. 220 (2005). Moreover, constitutional problems and/or separation of powers issues arise when the Sentencing Commission attempts to supplant its boss (Congress) by adding new conditions to the Probation statute, and then attempts to tell a separate branch (judicial) how to implement the probation statute. The PSR seems to take our view, as it recommends Probation with no Zone B conditions.

**(f) "The need to avoid unwarranted sentence disparities…"**

Title 18 U.S.C. § 3553(a)(6) addresses disparity, but it is aimed primarily at eliminating *national* sentencing inequity, not differences between the sentences of co-defendants. <u>United States v. Withers</u>, 100 F.3d 1142, 1149 (4th Cir. 1996). Thus, to the extent that Darryl Wright receives a term of imprisonment, it should not impact the sentence that Karen Wright receives, particularly since the charges both entered guilty

pleas to are quite different. A sentence of probation is consistent with the growing trend to revive this age-old form of punishment, and reduce the prison population, particularly for offenders with no prior criminal history. See Gall, supra.

**II.    The PSR**

The Defense and Probation agree on the ultimate issue – the sentence that Ms. Wright should receive (3 years' Probation). But on one topic – her culpability and/or level of acceptance - we part ways. See PSR para. 8 ("During that time…."); see also Response to Our PSR objections (end of PSR); Green Sheet Recommendation of Probation at p. 3. The PSR reaches conclusions that were in conflict and/or the jury in this case could not reach, such as suggesting that there was nothing wrong with Darryl Wright, and that Ms. Wright was involved in virtually every aspect of her brother's fraud. While the PSR correctly award her full credit for Acceptance (as does the plea agreement, para. 7), it did so with less than complete vigor.

On the issue of Darryl Wright's mental health, our evidence showed that those closest to him saw someone who had serious mental health issues upon his return from Iraq, which they had not noticed before. See KW Trial Testimony Day 10, p. 7. While he charmed those he interacted with in public, the family members testified that he was anything but charming/outgoing at home. Moreover, they had real concerns about a problem facing so many veterans – suicide – which had already been a concern in their family (Chuck Wright). They viewed his military

decorations (Combat Action Badge and Purple Heart) with pride, surmising that behind these accolades were experiences which explained Darryl Wright's changed mental health. See KW Trial Testimony Day 10, p. 7, 16-21 ("I was very, very proud of him and I posted it on Facebook because I was so proud of him."). The PSR/Government and the Defense disagree on whether anything was wrong with Darryl and/or whether his military service caused it. We are not alone. Thousands of pages of Darryl's military records contain the same conflict (i.e. one medical provider tells us there is nothing wrong with him, while another finds PTSD and extensive mental health issues). Suffice it to say this case mirrors mental health issues in general – they are hard to spot, hard to deal with, and are a long way from being fully understood.

On the issue of Karen Wright's involvement in the overall fraud committed by Darryl, again, there was ample dispute. The PSR makes no mention of the countless individuals who at first glance appeared to be in on the fraud, but were not (i.e. Buddy Statements from friends, including roughly 8 by Chuck Wright). The evidence at trial included documents in Karen Wright/Beven's name that were not created by her. For example, Defense Exhibit A-22 contained a report from VA Forensic Document expert Kirsten Singer, who opined that Darryl Wright had completed a bogus form in his sister's name. See Our Trial Ex. A-22. Likewise, the evidence also showed that Darryl Wright had submitted invoices to the Social Security Administration in the name of Bevens' Home Care, with no involvement (or

financial benefit) by Karen Wright. KW Trial Testimony Day 11, p. 16-17. The creation of these documents, about which she had no involvement, raises significant doubt as to her involvement in the overall scheme.

On one other minor point we disagree with Probation. In the Green Sheet Recommendation, Statutory Condition 1 recommends a total of 3 drug tests. The statutes cited in support (18 USC 3563a5 and 18 USC 3583d) seem to relate to drug convictions; moreover, they state that this requirement may be suspended if the PSR indicates no problem with drug use. Ms. Wright has no such problem, has not been tested while on bond, and should not be required to do so as part of Probation.

### III. Restitution

Paragraph 6 of the Plea obligates Karen Wright to pay between $40,000 and $82,000 in Restitution to the VA. We believe an appropriate amount of restitution is $40,000, equating to roughly ½ of the payments Karen Wright received. We reach this conclusion based on several points. First, Karen Wright provided some care to Darryl, and should be paid for it. Second, the specific requirements of the program were unclear and therefore it is unfair to require full restitution. Third, the low-end of the restitution range already vastly exceeds the sum that logically flows from the facts in the plea agreement, illustrating that our proposal is reasonable.

The Government bears the burden to prove the amount of restitution, and provide the Court with enough evidence to allow the court to estimate the "full amount of the victim's losses" with "some reasonable certainty." United States v.

Karen Wright's Sentencing Memo     15     PHIL BRENNAN, Esq.
422 Yale Ave N. Ste B
Seattle, WA 98109
(206) 372-5881

Doe, 488 F.3d 1154, 1159–60 (9th Cir.2007).  There must be "proximate cause" to link the defendant's actions, and the loss suffered by the actual victim.  Paroline v. United States, 134 S. Ct. 1710, 1720, 188 L. Ed. 2d 714 (2014).  The link cannot be attenuated; otherwise, the finding is more akin to mere fortuity, which the law does not allow. Id at 1721.

Karen Wright provided Caregiver services and should be paid for some of this time and not be required to reimburse the VA for all sums she received.  She testified that as a Caregiver, she was initially going to Darryl's house roughly 3 days a week, which increased over time (i.e. summers), and was up to 5 days a week by mid-2014.  Indeed, following her recovery from her car accident in the fall of 2013, she maintained this schedule at the expense of her own husband's needs, causing friction in that relationship.  Thus, having her repay the entire $82,000 she received over the entirety of her time at the VA, would amount to having her work for free over these years.

Second, there still remain questions as to precisely how many hours a Caregiver had to work.  The evidence revealed that she was not an employee of the VA, that the tier system/stipend did not specify a required number of hours of work, and that no one ever told Karen she must work a set number of hours/days.  The reality is that this program was in its infancy, overseen (at least initially) by one individual (Kris Fredrickson) with hundreds of participants, and suffered from growing pains common with any new enterprise.  In the analogous civil context (i.e.

breach of contract), one would expect to see a contract setting forth the obligations along with proof that those agreed-to conditions were not met. That is missing from this case. But we agree that expectations of the VA, when compared with the reality of Karen Wright's participation, warrant restitution.

Third, as in any negotiation that leads to a plea, the Defense is making concessions, which make our $40,000 pitch reasonable. The fact pattern in the plea agreement references a period of time covering 2 months when Karen was absent, which equates to around $5,000 of payments to Karen Wright ($2,500 x 2 months = $5,000). We concede that as a starting point, this sum should be factored into the restitution equation. We do so at the expense of a good argument - there is no evidence the Program stopped stipend payments when a Caregiver was on vacation and/or temporarily disabled. See KW Trial Testimony Day 10, p. 79-80, Day 11, p. 37-38 (KW emails CG Coordinator Tara Stablein re: does KW still receive stipend when DW is in inpatient? The evidence showed that KW received the stipend and there appeared to be no policy of suspending payments). We further concede that far more than $5,000 in restitution is warranted, reaching well beyond her period of vacation/disability referenced in the Plea Agreement. We did so because that is how difficult cases are resolved. But we do not lose sight of the challenges Karen Wright faced in caring for her brother, which warrant a restitution amount that recognizes some of the money paid to her was appropriate. Requiring her to repay roughly ½ of what she received is a fair result.

Karen Wright's Sentencing Memo     17     PHIL BRENNAN, Esq.
422 Yale Ave N. Ste B
Seattle, WA 98109
(206) 372-5881

Finally, we ask that the restitution order take into account the competing concerns of repaying the victim, while recognizing the challenge it presents to the defendant. Karen Wright has limited financial means and the family business is not robust. We ask that whatever sum is imposed, is one which allows for repayment in a manner that is feasible for her situation. See PSR para. 69 (Citing 18 U.S.C. §§ 3664(f)(2) and 3664(f)(3)(B). Respectfully submitted this date.

By: /s/_____
PHIL BRENNAN, WSBA #25711*
Attorney for Ms. Wright; Date: 8/10/16

*Certificate of Delivery
I certify under penalty of perjury that today I filed this document on ECF and also emailed a copy to USPO Acker.