The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>DARRYL LEE WRIGHT,<br><br>Defendant. | NO. CR14-5539BHS<br><br>GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM |

The United States of America, by and through Annette L. Hayes, United States Attorney for the Western District of Washington, and Assistant United States Attorneys David Reese Jennings and Gregory A. Gruber, hereby files this Supplemental Sentencing Memorandum to discuss the loss caused by Defendant DARRYL LEE WRIGHT and whether he obstructed justice. In addition, the United States questions whether defendant has truly accepted responsibility.

As explained in the United States' original Sentencing Memorandum, the United States seeks a sentence of five (5) years and restitution of $737,539.76. The United States also asks the court to remand DARRYL LEE WRIGHT at the time of sentencing, and order him to surrender his Purple Heart Medal, Combat Action Badge, and Purple Heart License Plates.

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 1

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

## I.     Introduction

DARRYL LEE WRIGHT pled guilty to two counts of a broad and long-lasting benefits fraud scheme.  WRIGHT led the scheme, which also involved his sister, his mother, and others.  To further his scheme, WRIGHT pretended to be severely disabled, primarily from fictional injuries sustained from an alleged rocket attack.  When it would further his scheme, WRIGHT claimed and even acted out severe physical and mental limitations.  Whenever it suited him, however, whether for recreation, work, social interaction, attending school, or visiting his daughter, WRIGHT was able to perform both physically and mentally at extremely high levels.  He demonstrated an uncanny ability to summon or dismiss his alleged symptoms.

WRIGHT employed his scheme whenever there was an opportunity to obtain some kind of benefit.  Sometimes the benefits were monetary; sometimes they were not.  Sometimes his scheme harmed people and institutions who merely tried to or wanted to help him.  The scheme harmed the following victims, for a total monetary loss of $737,539.36.

| | | |
|---|---|---|
| 1. | SSA disability | $181,438.20 |
| 2. | VHA Caregiver Program | $ 83,967.00 |
| 3. | VBA disability | $261,719.38 |
| 4. | OPM disability | $48,226.49 |
| 5. | State unemployment | $29,860.00 |
| 6. | Department of Education loans | $41,068.69 |
| 7. | Department of Commerce salary[1] | $91,260.00 |
| 8. | United States Army | (No monetary loss claimed) |
| 9. | Washington National Guard | (No monetary loss claimed) |
| 10. | VA physicians and healthcare providers | (No monetary loss claimed) |

---

[1] Calculated from the date he should have been terminated for submitting false orders to his employer at the DOC, but was accommodated because of his false claims that he was subjected to discrimination as a wounded veteran.

| | | |
|---|---|---|
| 11. | Disabled American Veterans | (*Terminated their representation of Wright because of his fraud*)   (No monetary loss claimed) |
| 12. | Various family members | (No monetary loss claimed) |
| 13. | Washington State Dept. of Licensing | (*Purple Heart license plates*)   (No monetary loss claimed) |
| 14. | Washington Dept. of Health and Human Services   (*Wright's application for benefits*) | (No monetary loss claimed) |
| 15. | United States Military Veterans | (No monetary loss claimed) |
| 16. | C. J. Jackson | (Other damages) |

**Total Monetary Loss            $737,539.76**

Since WRIGHT's plea of guilty, the Army formally revoked WRIGHT's illegitimate Purple Heart Medal and Combat Action Badge. The Disabled American Veterans terminated their representation and relationship with WRIGHT. The Veteran's Benefits Administration (VBA) in Seattle reassessed Defendant WRIGHT's disability rating, applying the evidence uncovered in the criminal investigation, and re-determined and reduced WRIGHT's percentage of disability in October 2016 to 30%. The VBA also determined that WRIGHT owed $261,719.38 for benefits it had overpaid him.

Doctor Kenneth Muscatel completed a Forensic Psychological Evaluation of Defendant WRIGHT, concluding a number of things that tend to support the argument that he is a calculating criminal, but also that WRIGHT appears to suffer from some PTSD. The report fails to clarify much that would be helpful in this criminal sentencing, since it notes that Defendant WRIGHT had preexisting criminal tendencies or leanings before leaving for Iraq, and that his service there may have exacerbated these tendencies. Veterans do not qualify for disability if their psychological issues are related to Axis II or Cluster B traits. Moreover, Defendant WRIGHT has engaged in multiple criminal events, before, during, and after his service, including assaults, rapes, trespass, theft, drunk-driving, hit-and-run, domestic violence, and, of course, all the criminal conduct in

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 3

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  the instant case.  If PTSD is traceable to stressful and traumatic events, then WRIGHT's

2  personal life offers far greater stimuli than did his one year of broken service in Iraq.

3       Despite all that has happened in this case, however, WRIGHT continues to insist

4  he is both completely disabled and fully entitled to benefits.  Unabashed, he continues to

5  pursue disability payments from the SSA, OPM, VBA and others.  He carefully parses

6  his words when talking about his convictions.  He deliberately misleads others when

7  describing his crimes.  He even steadfastly refuses to formally acknowledged things he

8  has done, many of which he has already admitted (sometimes even in writing).  Indeed, in

9  two places within the Presentence Report, WRIGHT objected to statements about his

10 fraud: first, he argued he did not submit the false affidavit stating that Karen Wright

11 provided him with 24-hour in-home care; second, he argued he did not submit the

12 fictitious story about his combat experience in conjunction with the Combat Action

13 Badge.  As noted by the Probation Officer, "suggesting that he is not responsible for the

14 content of an unsigned, second hand account of an incident from which he benefitted

15 further undermines the defendant's acceptance of responsibility."  It may well do so, but

16 as the hearing and the entire process of this case has taught everyone, denying the

17 obvious is classic DARRYL WRIGHT behavior.

18      From the moment he learned his lies were detected, DARRYL WRIGHT has been

19 shifting his game pieces so he might seek disability and other benefits under "different

20 truths."  When it comes to the crimes he actually acknowledges, WRIGHT apologizes

21 only in the vaguest of terms, without detail and without acknowledging that what he did

22 was wrong.  He discounts his crimes, arguing that he pled to specific "wires," not to

23 "engaging in a scheme to defraud."  WRIGHT is quick to argue that "charges were

24 dropped," implying they had no merit (both misleading and false).  When it comes to

25 accountability, WRIGHT is evasive, equivocal, and untruthful.

26

27

28

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 4

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**Application of Sentencing Guidelines**

**Relevant Conduct**

When applying the Sentencing Guidelines and considering an appropriate sentence, a sentencing court may consider all relevant conduct as defined under the Sentencing Guidelines at § 1B1.3. Moreover, the Court should consider the criteria listed under Title 18, United States Code, Section 3553(a). In this instance, the manner in which DARRYL WRIGHT defrauded state, federal and local entities is completely relevant to any sentence this Court may adjudge.

DARRYL WRIGHT has attempted to wield Application Note 3(F)(ii) of § 2B1.1 (the government benefits formula) as a shield against the Court's efforts to find the amount of loss he caused. WRIGHT argues that he should have and would have received roughly the same benefits had he refrained from fraud. Under normal circumstances, the United States has the burden of proving loss, by a preponderance of the evidence, for each category of fraud committed by a defendant. Indeed, the United States has already done this, calling witnesses to represent each category of loss. The witness testimony, combined with the exhibits introduced at the sentencing hearings, show that WRIGHT would have received <u>none</u> of the benefits he continues to seek (except the 30% disability from the VBA). On the other hand, WRIGHT has failed to present rebuttal evidence showing his "true state and functionality" at the time he applied for and defrauded the multiple agencies listed above. In some instances, WRIGHT has purposefully elected to introduce no evidence, preferring instead to appeal adverse administrative decisions (*e.g.*, SSA disability), which WRIGHT and his attorneys (Chris Black and Nicole Franklin) believe will give him a better chance of reopening the flow of benefits.

There is no dispute that WRIGHT's fraud was persistent and pervasive. At least one circuit has found that the burden of proof shifts to the defendant when his fraud is so pervasive that it becomes extremely difficult for the court to sift through things and determine the truth. *United States v. Nelson*, 732 F.3d 504, 521 (5th Cir. 2013). A single false statement is not enough to make a defendant accountable for all government

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 5

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

benefits he or she might have received, but when a "defendant has defrauded the government to such an extent that an accurate loss calculation is not possible, we have held the burden shifts to the defendant to identify which benefits are legitimate." *Nelson*, 732 F.3d at 521 (*quoting United States v Hebron*, 684 F.3d 554, 563 (5th Cir. 2012)).

In light of the evidence introduced during the sentencing hearing and during the trial of codefendant Karen Wright, this Court has the option of shifting the burden *or* simply relying on the absence of meaningful rebuttal from WRIGHT. Either way, WRIGHT has failed to move the needle on any of the administrative determinations already made on the losses he caused.

**Calculating the Loss**

The chart above sets out the monetary loss for several of the victim agencies. The chart does not include all of WRIGHT's intended loss, though perhaps it should. WRIGHT had no intention of skimming benefits for a fixed period, and then returning to the work place and becoming a productive citizen. WRIGHT intended to obtain all of those benefits – and likely any others he could imagine and "qualify" for – for as long as he lived.

WRIGHT began his scheme with his fraud against the Army, when he lied to obtain the Combat Action Badge. WRIGHT then made this fraud the keystone for nearly all his other frauds. In nearly every execution of his scheme, WRIGHT referred to his heroic deeds and points to his Combat Action Badge and Purple Heart.

**Veterans Benefits Administration                    $261,719.38**

The best example of how WRIGHT used his phony badges and medals was found in how he built up his claims for disability with VBA. The testimony of Clinton David of the VBA explained how WRIGHT used the significance of his Combat Action Badge to lard his benefits claims over the years. During his May 4, 2017 testimony, Mr. David further explained how and why WRIGHT's disability rating was reduced to only 30%. Mr. David took the Court, defense counsel, and even a skeptical defense "expert" witness through the process of how WRIGHT's disability rating was recalculated. Mr. David

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 6

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  explained the arduous process of how he had reviewed DARRYL WRIGHT's entire VA

2  file, including WRIGHT's voluminous medical files, and pointed out how WRIGHT had

3  stacked psychological and even physical medical claims on top of the phony rocket

4  attack.  Mr. David explained in detail, on direct and perhaps even better on cross-

5  examination, how the non-events of the August 30, 2005 "rocket attack" had influenced

6  and skewed WRIGHT's disability claims.  Mr. David reviewed WRIGHT's service

7  records, specifically WRIGHT's post-deployment questionnaires, and made a

8  comprehensive assessment of where WRIGHT's disability should really be, now that the

9  truth about WRIGHT was known.  Mr. David concluded that WRIGHT was entitled to a

10 30% disability rating, and calculated WRIGHT's overpayment at $261,719.38.

11      Mr. David was able to pinpoint the precise moment, the exact omission, and the

12 foundation medical report where WRIGHT's false account of the "rocket attack" was

13 absorbed into the VA's records.  Mr. David then found the subsequent report, which

14 specifically failed to review the earlier report, where the psychologist placed reliance on

15 WRIGHT's account of the rocket attack, including the underlying events.  Mr. David's

16 testimony was supported not only by the proven false descriptions included by WRIGHT,

17 but also by the finding that WRIGHT's main problem was his difficulty with

18 relationships with women.  Over the years, at least five psychologists have concluded that

19 WRIGHT's primary problem was his difficulties with women, not events occurring

20 during his service in Iraq.  Others who evaluated WRIGHT, such as Dr. Muscatel and Dr.

21 Phillips (who testified for WRIGHT), have acknowledged that at least some of

22 WRIGHT's problems stem from issues that WRIGHT shares with just about every other

23 antisocial person who commits crimes.

24      **VA Caregiver Program**                    **$ 83,967.00**

25      DARRYL WRIGHT's sister Karen Wright participated in the scheme to defraud

26 the VA Caregiver Program.  At Karen Wright's sentencing, however, this Court split the

27 loss and restitution figure for the Caregiver Program, and ordered that Karen Wright pay

28 $40,000.00.  The Court based its decision, in part, on the fact that DARRYL WRIGHT

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 7

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    kept his family in the dark about the full extent of his fraud, particularly his fabrication of

2    traumatic events in Iraq.  Moreover, Karen Wright was found to have provided some care

3    to WRIGHT, whether the VA intended for him to have it or not.  The Court noted,

4    specifically, that its finding did not preclude that DARRYL WRIGHT could be held

5    accountable for the entire amount of the caregiver program payments.  (Karen Wright

6    Sentencing Hearing transcript, August 17, 2016, at p.12).

7          During the extended DARRYL WRIGHT sentencing hearing, the United States

8    introduced exhibits and testimony showing that WRIGHT should be held accountable for

9    the entire amount of loss to the Caregiver Program.   The United States introduced

10   Exhibits 6, 6.1, 14, and 14.1, which showed the documents filled out by WRIGHT and

11   the results of the multiple home visits conducted by VA nurses and psychologists.

12   Summary Exhibit 60 showed the activity and functionality of WRIGHT during the time

13   he claimed to have needed a caregiver.  This summary exhibit showed when Wright was

14   traveling with his daughter, with his girlfriends, going to Las Vegas, going on ocean

15   cruises, and travelling to Idaho to spend a week each month with his daughter.  The

16   sympathetic, cowed, and withdrawn character WRIGHT impersonated during home visits

17   by VA Caregiver personnel, and when answering questions and providing information to

18   the Caregiver Program, was vastly different from the true DARRYL WRIGHT.

19         Tara Stablein of the VA testified on April 17, 2017, about the Caregiver Program

20   and WRIGHT's fraud against it.  (4/17/17 transcript at p.53).  Ms. Stablein explained that

21   the Caregiver Program was part of a clinical program, and payments were made by the

22   VA's Healthcare Services branch.  VA doctors prescribed the Caregiver Program to assist

23   veterans in their efforts to recover from service-connected disabilities.  To qualify, the

24   veteran had to have a service-connected injury (not an illness), and must have needed

25   assistance with the activities of daily living.  (4/17/17 transcript at p.54).  More

26   specifically, to qualify the veteran had to show a need for assistance with the activities of

27   daily living, on a daily basis, for a period of six months or more.  In the alternative, the

28

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 8

1  veteran had to display a need for oversight or supervision, on a daily basis, for their own

2  safety, for a period of six months or more.  (4/17/17 transcript at p.56).

3      The activities of daily living or ADL's included bathing, grooming, toileting,

4  dressing, and eating.  Eating meant being able to feed yourself, not the ability to prepare

5  meals.  (4/17/17 transcript at p.57).  Supervision meant that a person was delusional,

6  hallucinating, preoccupied with suicide or homicide, or so dysfunctional that they were

7  unable to leave their home.  (4/17/17 transcript at p.58).  Ms. Stablein used eating as an

8  example of an activity of daily living.  At the lower end of need, such a person would

9  need help applying safe-swallowing techniques, might require help opening a small

10  package, or help with dexterity getting small items to their mouth.  (4/17/17 transcript at

11  pp. 59-60).  At the extreme or top end of need, a person would need someone to bring the

12  fork or spoon to their mouth to feed them.  (4/17/17 transcript at p.60).

13      When applying for the Caregiver Program and at other times, DARRYL WRIGHT

14  claimed he needed the maximum amount of assistance.  In fact, as the evidence at Karen

15  Wright's trial demonstrated, he needed no assistance.  Ms. Stablein then answered a

16  series of questions, based on DARRYL WRIGHT's true capabilities (as adduced at trial

17  and admitted in the Plea Agreement), and confirmed that a person with DARRYL

18  WRIGHT's capabilities would not qualify for the VA Caregiver Program.

19      On cross-examination, Ms. Stablein confirmed that it was the need for care, not

20  the level of disability, which qualified a person for the program.  (4/17/17 transcript at

21  p.74).  Ms. Stablein also confirmed that two of WRIGHT's activities, providing care for

22  his minor daughter without supervision, and serving as a first responder, would

23  *automatically disqualify* WRIGHT from the Caregiver Program.  (4/17/17 transcript at

24  p.75).  If he could do those things, WRIGHT should never have been in the program in

25  the first place.  *Id.*  Later, Ms. Stablein affirmed that even a person who was 100%

26  disabled would be disqualified from the Caregiver Program if he or she was nonetheless

27  able to function.  (4/17/17 transcript at p.77).

28

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 9

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

Defendant WRIGHT nonetheless insists that he was and remains completely disabled, but currently refines his argument to claim that his disability "comes and goes." He further argues that there was evidence of his periodic disability presented at trial. Indeed, WRIGHT has explored trying to have his new girlfriend, Heather Munden, installed as a VA caregiver.  In truth and fact, the evidence at trial showed there were no times when WRIGHT was unable to function.  He was able to show up and perform, on schedule, as needed, whenever he found sufficient motivation.  The only witnesses who testified that WRIGHT had difficulties were his sister (also charged in his scheme), and his mother.  Both, however, participated in WRIGHT's scheme, and both were also victims of WRIGHT's scheme.  In contrast, all of WRIGHT's girlfriends, acquaintances, friends, neighbors, members of local government, teammates, and even his daughter, testified that DARRYL WRIGHT was able to function at an extremely high level, at all times, and that he showed no need for a caregiver.

Perhaps more important than what was presented at trial is that WRIGHT offered no evidence during the sentencing hearings that would counter what the Court heard during trial.  On the contrary, the testimony of Ms. Kathleen Simko of SAGE, heard on April 25, 2017, undermined all the claims by WRIGHT and his family, that WRIGHT returned from Iraq as a different, hobbled man.  Ms. Simko testified that DARRYL WRIGHT functioned in a full-time job at a wonderfully high capacity, both before and after his deployment to Iraq.  DARRYL WRIGHT was a highly desirable, prized employee, who showed zero shortcomings or difficulties.  He was dependable, high achieving, and intelligent.  He showed no signs of alcohol abuse or other problems.  Ms. Simko liked him so much that she set up and went on playdates with DARRYL's daughter and her granddaughter.  For what Ms. Simko remembered to be roughly two full years, DARRYL WRIGHT performed as a model employee.  The party line, retold again and again by WRIGHT's family, that DARRYL WRIGHT did nothing after returning from Iraq but lay about, drink and suffer, was obviously untrue.  The family members

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 10

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  who only saw him occasionally after his return, were either fooled by WRIGHT, or,

2  perhaps, hoped to help him by corroborating his fanciful claims.

3       Finally, the VA Caregiver Program benefits were directly connected to

4  WRIGHT's contaminated VA medical records.  WRIGHT received ongoing treatment

5  from the VA for trauma that did not occur, causing other veterans to wait their turn in an

6  overcrowded system.  WRIGHT's complaints about pain, suffering, and mental

7  difficulties, most of which were connected to the "rocket attack," were/are all suspect.

8  The combination of WRIGHT's countless lies and the evidence of his true functionality

9  confirm what several doctors concluded—that WRIGHT was malingering.

10  **Social Security Disability**           **$181,438.20**

11       DARRYL WRIGHT applied for Social Security disability in early 2010.  Because

12  WRIGHT was a wounded veteran, SSA treated his application with special attention and

13  speed.  Along with the application, WRIGHT submitted documents from a nurse from the

14  Washington State Department of Social and Health Services, "Elaine Spalding," an

15  insurance form filled out in part by the same nurse, and a picture of a blown-up Humvee

16  that he claimed was his.  The picture described how the Humvee was destroyed during an

17  insurgent attack in the summer of 2005 at FOB Warrior in Kirkuk.  WRIGHT later

18  submitted a "Function Report," a required element of any application for SSA disability.

19       In support of his SSA application, WRIGHT also submitted VA medical records,

20  and gave the SSA full access to his VA medical file.  Based on these and other

21  documents, SSA rapidly approved WRIGHT's application and placed him on SSA

22  disability.  SSA included additional money for WRIGHT's daughter, whom he falsely

23  claimed was his full-time dependent.  Payments began flowing to WRIGHT in April of

24  2010, with the first payment representing disability going back to August of 2009.

25  (Exhibit 5.212).

26       The evidence at the trial of Karen Wright and during the sentencing hearings

27  demonstrated that WRIGHT's SSA disability application was packed with lies,

28  exaggerations, and false statements.  The Spalding letter was exposed as a fabricated

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 11

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

document.  The medical records, including the medical assessment by Elaine Spalding, were exaggerated, misleadingly attributed, and false.  Most important, everything in the SSA application was tainted by WRIGHT's false and fraudulent VA records, which WRIGHT had built up over the years.  Had WRIGHT told the truth in his SSA application, he would never have qualified for SSA disability.

The function report was a material potion of the SSA disability application.  The evidence at Karen Wright's trial contradicted what WRIGHT described in his function report, and confirmed WRIGHT's true ability to function.  More than a dozen witnesses marched into court and testified about DARRYL WRIGHT coaching and playing basketball, hiking, swimming, serving as an emergency responder, attending and running public meetings, seeking positions on public boards, vacationing, and showing no signs of either physical or mental disability.  WRIGHT's description of his disability, found on the last page of his SSA application, described symptoms and conditions that no witness would or could verify.  Wright stated as follows:

**I have occupational and social impairments with deficiencies in most areas, such as work, relationships, judgment, thinking, and mood, due to such symptoms as: suicidal idealization; obsessional rituals which interfere with routine activities; cognition intermittently illogical, obscure, or irrelevant; near-continuous panic, depression, and chronic pain affecting the ability to fm1ction independently; impaired impulse control; and spatial disorientation. Difficulty breathing and chronic respiratory failure; constant abdominal distress; severe, debilitating migraines with very frequent completely prostrating and prolonged attacks; impaired memory, attention, concentration, and executive functions. I have received the following accommodation from my employer: Flexible work schedule, periodic FMLA leave, and advanced sick leave.**

Exhibit 5.016.

The adulterated VA medical records, which contained the lies WRIGHT had been telling VA doctors over the years, infected his SSA application.  For example, in the insurance document WRIGHT submitted with his SSA application, WRIGHT stated as

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 12

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

follows:

> As noted in the enclosed VA and military documentation, the veteran lead 93 combat patrols in the Kirkuk region of Iraq between 15 April 2005 and 28 October 2005.  He is the recipient of the Combat Action Badge and is currently rated as a 70% combat-related disabled veteran (appeals still pending).  Due to the numerous combat operations the veteran lead, there is not just one single traumatic event which transpired; there were several.  While in Iraq the veteran was exposed to sand, dust, rocket attacks, IEDS, complex ambushes, intense sun exposed, smoke from oil fires, and airborne and waterborne pollutants and toxins.  He ate and drank contaminated food and beverage, other than provided by the Armed Forces.  He bathed and drank water containing smoke.  While working at the K1 Iraqi compound in Kirkuk, the veteran was also exposed smoke and fumes from tent heaters, passive smoke from others smoking, diesel and other petrolchemical fumes, burning trash and feces, paints and solvents, depleted uranium, radar systems, and pesticides.
>
> Between 15 April 2005 and 28 October 2005 the veteran experienced "danger close" exposure to five IED and 107mm rocket explosions, thus being exposed to multiple concussive events. During this time the veteran was in eminent danger of being injured or killed 13 to 15 times.

Exhibit 5.018.

All evidence at Karen Wright's trial and the evidence at the sentencing hearings was contrary to WRIGHT's description above.  Indeed, WRIGHT frequently denied some of the symptoms above, such as suicidal ideation, when it suited him.  The truth at this time was that WRIGHT had recently been kicked out and divorced by his wife, and was living with his mother.  The truth was that he was growing increasingly bold in a scheme to defraud.  Divorce is one of the worst things that any person can experience, but the emotional pain it brings rarely qualifies anyone for disability.

More than two years after WRIGHT began receiving SSA Disability payments, SSA was alerted that WRIGHT was still employed and still receiving two federal

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 13

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

salaries—one from the Department of Commerce, and one from the Washington National Guard.[2]  No matter what his true condition, WRIGHT was prohibited from receiving both disability and pay for work.  WRIGHT was thus obligated to repay the disability money to SSA, *unless* he could prove some exception applied.

There is no longer any doubt as to how WRIGHT scaled this hurdle:  he fabricated invoices for caregiver services, claiming that he needed, and in fact, had paid a full-time caregiver while he struggled to continue working for the Department of Commerce.  Further, he provided SSA with documents showing that he made claims against his employer for discrimination, that they had settled these claims, and the salary was part of the settlement.  He also submitted a false affidavit, claiming he had a fulltime, 24-hour-a-day, seven-day-a-week caregiver.  He submitted additional exaggerated function reports, one of which he falsely attributed to his sister.  All these false documents helped WRIGHT convince SSA to forgo collecting the disability payments he received while he was still employed (*i.e.*, overpayments).  It also convinced SSA to allow him to remain on disability.  On top of all the false statements and fabricated documents, WRIGHT continued to supply and rely on the polluted VA records, including his fraudulently obtained VA disability rating, to persuade SSA to keep sending him money.

Special Agent Joe Rogers of SSA OIG testified about the disability loss on the first day of the sentencing hearing, August 25, 2016.  Agent Rogers explained that the $181,438 figure in Exhibit 68 represented the actual loss to SSA from Defendant WRIGHT's fraud.  This number, like the loss for VBA, did not include the total amount of intended loss (which <u>could</u> otherwise be calculated under the Sentencing Guidelines).  Agent Rogers testified that WRIGHT functioned at a very high level, not at all as WRIGHT reported to the SSA.  (8/25/16 transcript at p.25).  Agent Rogers added that WRIGHT had admitted, under oath, in an Idaho family court proceeding in 2016 that he

---

[2] When DARRYL WRIGHT applied for SSA disability, he was still working for the Department of Commerce full time, and still part of the Washington National Guard.

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 14

1  was working, writing grants, and taking business losses for his company of

2  approximately $30,000.00 to $40,000.00 a year. *Id.* Agent Rogers reaffirmed that SSA

3  disability was all or nothing, that there was no proportionate payment based on a

4  percentage of disability. (8/25/16 transcript at p.26).

5      SA Rogers testified that his investigation uncovered evidence showing that

6  WRIGHT was able to function at a far higher level than what he described in his SSA

7  application and in SSA function reports. (8/25/16 transcript at p.37). In all his many

8  years investigating disability fraud, WRIGHT's conduct was among the most outrageous,

9  if not the most outrageous, Agent Rogers had ever investigated. (8/25/16 transcript at

10  p.39).

11      After this testimony, the Court inquired of defense counsel,

```
18  I guess put it another way, had the Social Security
19  Administration known that much of this information was false
20  or exaggerated, the opinion given that it would not have
21  awarded benefits, I think is an opinion that he can express.
22  But what ends up being the issue before the Court is what
23  functionality did he actually have and would that
24  functionality have a level of functionality that precluded him
25  from any gainful employment in the national economy.
```

(8/25/16 transcript at p.43).

The Court was correctly applying the government benefits test, explained above, and wondering about WRIGHT's true functionality. Despite the Court's call for clarity, WRIGHT did not then or later introduce evidence of his true functionality. Months later, when WRIGHT called an "expert" to testify about his SSA disability claim, the expert specifically declined to engage in an exercise to determine WRIGHT's true functionality, explaining that it would do WRIGHT no good.

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 15

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

9   Q.   Did you ever interview Mr. Wright and go through this file
10  with him?
11  A.   No, I did not -- I have spoken with him and interviewed
12  him, but I didn't go through this file page by page with him.
13  Q.   Did you ever undertake to put together a new application
14  based on reliable information and function reports to see
15  where Darryl Wright would stand were he to submit an
16  application today?
17  A.   No.   And the reason is because he's appealing them
18  revoking his benefits and the overpayment.

(5/17/17 transcript at pp. 80-81).

The witness, Attorney Nicole Franklin, specializes in SSA claims.  Before stating the answer shown above, Ms. Franklin admitted she had no experience with the United States Sentencing Guidelines, and that she purposely omitted to address the Guidelines calculation.  Though her letters, provided to the Court earlier, in fact offered opinions about the calculation of loss, Ms. Franklin admitted that her letters were in fact "collaborations" with defense counsel.  On cross-examination, Ms. Franklin resisted or attempted to deflect questions designed to determine WRIGHT's true condition when he applied for SSA disability, as opposed to what he falsely claimed to VA doctors and the SSA.  Finally, Ms. Franklin admitted she never intended to answer such questions (including the Court's question above), but instead answered one of her own making.

She testified specifically as follows:

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 16

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

14   Q.   But for purposes of this hearing, what we need to know is

15   whether Darryl Wright, if he applied and told the truth in

16   2010, would be able to get disability from Social Security.

17   You understand that's the distillation of this formula?

18   A.   Sure.

19   Q.   What would the government have intended him to actually

20   have, and to know that we have to know, if he told the truth,

21   what would the circumstances have been?   You understand that?

22   A.   Yes, I understand it.

23   Q.   Your opinion appears to be something different.   Your

24   opinion seems to be -- and correct me if I am wrong -- that

25   you are reading certain records within the Social Security

1   application and saying that, even taking out a couple of these

2   false records, they still could have found, with the records

3   they had, not all the records you know about, but with the

4   records they had, there might have been some way for Darryl

5   Wright to continue to receive disability?

6   A.   Correct.

   On redirect examination, Ms. Franklin again confirmed that she had not and would

never attempt to determine where WRIGHT would stand were he to correctly fill out an

SSA disability Application:

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 17

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

Q.   Thank you.  Mr. Jennings questioned you about whether you filled out a new application for Mr. Wright for Social Security?

A.   Right, right.

Q.   Is there a reason why you would have done that or wouldn't have done that?

A.   Yeah, there's a reason I definitely wouldn't have done that.  I think it would be a bad idea for him.  He already has an application pending, an appeal pending.  If he were to file a brand new application, the issue would be you can't have two at the same time, so he would have to actually withdraw his prior application and withdraw his appeal, but then that would have the effect of him admitting that he owes back the extensive amount of money that he owes them.

So that wouldn't make a lot of sense to do and particularly wouldn't make sense in this case because I think he can just proceed on his appeal and make the same argument that he could make on a new application.  So for that reason, I would just never encourage him to do that.  I think that would be a very bad idea.

Whether he filled it out and filed it, or simply filled it out and used it at his sentencing hearing, the net effect would be the same: the truth about WRIGHT's functionality would kill his ongoing efforts to win SSA disability.  Accordingly, rather than address the issue in the sentencing hearing and under the Guidelines, WRIGHT chose instead to preserve his chances of prevailing on administrative appeal.  WRIGHT's driving need to maintain some kind of advantage in trying to obtain SSA disability, even after being convicted of a fraud scheme involving those very same benefits, was more important to WRIGHT than telling the truth at his sentencing.

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 18

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

Finally, WRIGHT also tried to claim that his employment at Commerce somehow should not disqualify him from SSA disability.  Specifically, WRIGHT attempts to convert the accommodations DOC made for him into an SSA exception known as a "sheltered workshop."  This is absolutely incorrect.  "Sheltered work" is work done by people with disabilities under special supervision.  This work is performed at designated "sheltered workshops," which are sometimes referred to as work centers.  Sheltered work often pays below minimum wage (legally) and is geared towards providing disabled people with the basic skills needed to work in the general economy.  Here, Commerce gave WRIGHT accommodations, at his request, while his fraudulent EEOC claim was pending.  WRIGHT was working from home for a large part of this time.  Commerce expected WRIGHT to work and perform (even though he did not do much of anything).  In fact, WRIGHT later used his "inability" to perform as a basis for claiming OPM disability.  In the end, in a blatant example of his extreme chutzpah, WRIGHT even dared to ask Commerce for a promotion, *after* his separation, based on his "performance."

**OPM disability                          $ 48,226.49**

WRIGHT negotiated and obtained disability from his employer as part of his severance from the Department of Commerce.  WRIGHT also separately applied for disability.  Special Agent Rogers testified about the application on the first day of the hearing, and introduced some of the underlying application records in Exhibit 7.  The United States later called Eva Ukola, on April 25, 2017.  Ms. Ukola adopted her declaration (exhibit 2), and testified about WRIGHT's disability application.  Ms. Ukola explained the process and criteria for applying for federal Office of Personnel Management disability.  She described two basic requirements:  1) a medical condition; 2) that affects and ultimately prevents someone from doing their job.  (4/25/17 transcript at p.87).  Exhibit 7 listed WRIGHT's claims for which medical conditions interfered with his job (combat injuries and car accidents, Ex. 7.007), and later listed how his medical condition interfered with his ability to do his job:

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 19

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

5. Describe how your disease(s) or injury(ies) interferes with performance of your duties, your attendance, or your conduct.

Occupational and social impairment, due to such symptoms as: gross impairment in thought process and communication; persistent delusions, anxiety, and depression; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living; disorientation to time or place; memory loss; and deficits in mental processing speed.

WRIGHT's description above cannot be called a gross exaggeration, since the word "exaggeration" implies there was some original kernel of truth. WRIGHT's description was outrageously false, and notably inconsistent from the claims defendant repeatedly made in Family Law Court regarding his ability to care for his daughter. Ms. Ukola then explained that, if a person were fired for misconduct or even criminal conduct, they would be disqualified for disability unless the misconduct was caused by the medical condition. (4/25/17 transcript at pp.92-93; Declaration at Exhibit 2). Finally, Ms. Ukola confirmed that OPM disability was all-or-nothing, and that there was no percentage formula for partial disability.

On cross-examination, Ms. Ukola repeatedly insisted that WRIGHT was not and never would have been eligible to receive OPM disability. WRIGHT's counsel repeatedly insisted that WRIGHT should in fact be entitled to disability--if indeed he truly suffered from PTSD and depression. WRIGHT's counsel failed, however, to introduce evidence or to even ask or establish whether any condition, real or imaginary, recently fabricated or genuinely diagnosed, had in fact impaired WRIGHT's ability to do his job at Commerce. WRIGHT assumed, as did his "expert" Ms. Franklin, that if WRIGHT were somehow in fact disabled, then of course he was automatically entitled to disability payments. WRIGHT also insisted, as did Ms. Franklin, that an opinion of or acknowledgment of "disability" somehow proved all the statements made by WRIGHT to support his claim of "disability." WRIGHT blindly insisted that an opinion or acknowledgment of disability, from someone in authority, somehow erased all his false and fraudulent statements about his ability to function, and all the other lies he told. Indeed, all of WRIGHT's loss arguments rely on this circular logic.

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 20

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   In the end, if there was any doubt, the testimony of Ms. Simko established that
2   DARRYL WRIGHT could function, on the job, at the highest level, if he chose to do so.
3   In sum, there was no evidence that WRIGHT would ever have qualified for OPM
4   disability, then or now.

5   **State Unemployment                      $ 29,860.00**

6   Counsel conceded, in response to the Court's inquiry, that this category of loss
7   was unworthy of contest.  In the event WRIGHT responds otherwise in his brief, the
8   United States notes that it called Ms. Deborah Brookshire at the first hearing (8/25/16) to
9   testify about defendant's claims for unemployment with the State of Washington.  Ms.
10  Brookshire discussed Exhibit 8, which was the employment security file for DARRYL
11  WRIGHT.  WRIGHT applied for unemployment in the summer of 2012, shortly before
12  being awarded OPM disability and shortly after having provided SSA false caregiver
13  invoices.  After convincing SSA that he was severely disabled and unable to work,
14  WRIGHT applied for unemployment, claiming he was able and available to work.

15  The State initially denied WRIGHT unemployment because he voluntarily
16  separated from the Department of Commerce.  WRIGHT then attacked Employment
17  Security, claiming, among other things, that he was fighting for all the veterans who had
18  committed suicide because of the failure of state and federal agencies to accommodate
19  wounded veterans.  WRIGHT wheedled as follows:

20

21  If your agency would have requested this information, I would promptly supply the supporting
22  documentation, just as I am now.  I bring up this concern and frustration because I am a disabled
23  combat veteran and the national economic hardship has had a considerable strain on veterans and
24  military services members.  The suicide rates of military personnel and combat veterans is at an all-time
25  high, and part of this, in my opinion, is due to lack of support and resources from state and federal
26  agencies.  **For the sake of other unemployed disabled veterans that come into your office after me, I
    respectively request that your give them the support and follow through that I did not receive.**

27

28

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 21

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  (8.093).  He then argued that his employer's harassment of him (because he was a

2  wounded veteran), and their refusal to accommodate him, made his separation

3  "involuntary."

4

In addition to the supporting medical and government documentation, my former federal-agency-of-

5  employment, the US Department of Commerce – Economic Development Administration was charged

6  with workplace harassment and discrimination due to my combat-related disabilities. Settlement

7  agreements were reached regarding the harassment and discrimination; however, the terms of these
   settlements cannot be disclosed, as mandated by the terms of the settlement agreements. Redacted

8  copies of these settlement agreements (Agency Case Numbers 10-052-01809, 10-5200178, and 10-52-

9  01809) are enclosed in order to demonstrate that part of the reason why I resigned from employment

10  was due to a hostile work environment, which promoted harassment and discrimination based on my

11  disabilities.

12  WRIGHT then repeatedly and fraudulently affirmed he was able and available to work, in

13  order to receive his unemployment, and, later, to be paid to go to school.  WRIGHT also

14  filled out logs, falsely claiming he had been looking for work.

15        **Department of Education loans           $ 41,068.69**

16        In his campaign to get every conceivable benefit available to wounded veterans,

17  DARRYL WRIGHT defrauded the United States Department of Education.  The

18  Department of Education has a program that forgives repayment of student loans for

19  qualified veterans.  Chris Odom of the Department of Education testified on April 25,

20  2017.  Mr. Odom explained that, to qualify for the debt discharge program, a borrower

21  can establish he is qualified if he provides proof that the VA or some other agency has

22  determined that he or she is 100% disabled.  In the alternative, an applicant can submit a

23  letter from a doctor declaring that the individual is totally and permanently disabled

24  100%, for five years, or expected to last for five years.  A determination by the VA of

25  100% disability may be relied upon to forgive the loans.  Like other benefits, the loan

26  discharge program is all or nothing.

27        WRIGHT applied for discharge of his student loans on the premise that he was

28  rated 100% disabled by the VA.  WRIGHT submitted copies of his Purple Heart and the

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 22

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  false Spalding DSHS letter (Ex. 67.015-67.017).  Since WRIGHT has since been proven
2  to have been, at most, only 30% disabled, and because WRIGHT relied on the VA's
3  determination that he was 100% disabled to obtain the loan discharge, the discharge of
4  his student loans should be included in the loss total.

5  **Department of Commerce Salary                  $ 91,260.00**

6      DARRYL WRIGHT's most flagrant abuse of his fraudulent status as a wounded
7  warrior was his conduct with the Economic Development Agency, which is part of the
8  United States Department of Commerce.  At roughly the same time WRIGHT's wife
9  kicked him out of the house and filed for divorce, and contemporaneous with when he
10 was staying with his mother and dealing with his failed marriage, WRIGHT began
11 missing work.  WRIGHT claimed it was because of his "combat related disability," but
12 his ex-wife and several doctors would argue that it was WRIGHT's obvious problems
13 with relationships and with handling rejection.  Whatever the cause, WRIGHT stopped
14 trying.

15      By the end of summer 2009, WRIGHT had no leave left to take.  He was in
16 ongoing disputes with his employer.  He had begun creating false "Buddy Statements" to
17 beef up his disability claims with the VA.  In September 2009, to obtain additional paid
18 leave, WRIGHT fabricated military orders and submitted them to his employer, EDA.
19 The orders looked strange, raised suspicions, and so resulted in WRIGHT being caught.
20 Christina "CJ" Jackson with the EDA was responsible for blowing the whistle on
21 WRIGHT.  The National Guard stepped in and investigated his actions, and WRIGHT
22 admitted to creating and submitted false military orders.  In any other setting, with any
23 other person, it would have been the end of employment with the federal government.

24      Instead of walking away, WRIGHT did what he always does—he attacked.  He
25 filed harassment and discrimination claims, against individuals and the entire agency,
26 accusing them of harassing him and discriminating against him because he was a
27 wounded veteran.  He forced them to take sensitivity training for wounded veterans.  He
28 used his phony status as a wounded, suffering veteran to torture CJ Jackson and anyone

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 23

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  else who might get in his way!  He accused them and Commerce of harassing him
2  because he was a wounded veteran, thus making it difficult if not impossible for them to
3  sever him.  By cloaking himself in the sacred mantle of a wounded, decorated veteran,
4  WRIGHT made himself virtually untouchable.  WRIGHT used these ridiculous claims to
5  resist termination, to obtain additional concessions, and, ultimately, to have his leave
6  without pay converted into paid leave.

7  WRIGHT's primary whipping girl, CJ Jackson, told this Court of the emotional
8  and financial harm done by WRIGHT.  She sustained losses for medical care, legal
9  counsel, and to her reputation.  For purposes of loss, none of this may be added to
10  defendant's total.  Even though WRIGHT had been caught in the act of falsifying
11  military orders, an offense for which someone could be court-martialed, the respect for
12  and deference to wounded veterans enabled him to prolong the process.  In fact, it
13  leveraged his position, allowing him to obtain benefits, concessions, and finally a
14  settlement to which he was never entitled.

15  The prosecution has the benefit of hindsight and a multi-year investigation, which
16  now tells us that WRIGHT was a liar, a bully, and a scaly opportunist.  The Department
17  of Commerce had no such knowledge, no such insight, and no way to feel confident that
18  it could safely terminate WRIGHT without him creating a major scandal for the
19  Department of Commerce.  The last thing anyone wanted, whether it be an agency or an
20  individual, was to be accused of mistreating a wounded veteran.  DARRYL WRIGHT
21  knew this and fully exploited it.  Indeed, he is *still* using it in this case in his effort to
22  avoid just punishment for his crimes.

23  WRIGHT also used his scheme against Commerce to help him with the execution
24  of other parts of his scheme.  He used the "discrimination settlement" to reverse an
25  adverse decision by the Washington State Department of Employment Security.  He used
26  the fraudulent claims to help persuade SSA to continue his disability payments (after
27  SSA learned WRIGHT was still receiving wages from Commerce).  Although WRIGHT
28  claimed he was precluded from disclosing the terms of the settlement with anyone, he

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 24

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

nonetheless sent pieces of the agreement to others when is suited him.  (*E.g.*, Exhibit 5.163).  The complete agreement awarded WRIGHT 240 hours of paid leave for all the leave he took without pay after January 1, 2010, streamlined applications for transit benefits, and required all EDA staff in Seattle to take training for working with veterans with "polytrauma."  The settlement also required certain individuals, including CJ Jackson, to take Privacy Act training.  It even awarded WRIGHT $5,500 in attorney's fees.  WRIGHT converted certain-death employment termination into a personal boon, all by falsely claiming he was a wounded veteran who was subjected to harassment and discrimination.

WRIGHT now argues that he should not be responsible for this outrageous fraud, citing, among other things, that Commerce failed to commence formal termination until long after he was caught submitting fabricated orders.  This and other arguments he has made relies on the caution exhibited by his victims, who he was simultaneously suing for discriminating against a wounded veteran, and attempts to take advantage of their careful delay in dealing with him.  Obviously, it would have been much easier for Commerce to fire and be rid of WRIGHT if they had the advantage of a complete criminal investigation, a guilty plea, and the evidence presented at trial and these sentencing hearings.  The failure by Commerce to take swift action against WRIGHT, who claimed to be a Purple Heart-decorated veteran, is not only understandable but also responsible.

We should all want agencies, and individuals, to be sensitive to the difficulties and challenges of our veterans.  It is utterly outrageous for WRIGHT to now point to their honorable restraint as justification for being permitted to keep the proceeds of his fraud.  Sadly, predictably, the argument is consistent with everything else DARRYL WRIGHT has argued and done.

In sum, the testimony has established that the Department of Commerce paid WRIGHT $91,260.00 from the date he should have been terminated for fraud.  The Court could, under the circumstances, order Defendant to repay the attorney's fees as well.

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 25

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 **Obstruction of Justice**

2 The Court has indicated a preliminary finding that it was more Heather Munden

3 than WRIGHT who distorted MM's letter.  What this Court has not yet heard is that the

4 United States warned WRIGHT's counsel, before WRIGHT filed the offending letter,

5 that MM had complained that her letter had been confiscated and the one submitted in her

6 name did not contain her true feelings.  Somehow, knowing this, WRIGHT nonetheless

7 filed the offending letter with the Court.  Somehow, knowing this, WRIGHT drafted a

8 declaration that carefully scripted the creation of the letter (but which fails to explain why

9 he insisted on filing it).  Defense counsel surely told WRIGHT about MM's position on

10 the letter.  Accordingly, one has to ask:  Why would anyone ever file such a letter,

11 knowing that the purported author wishes to recant and retract it?

12 WRIGHT also made ridiculous denials to the Probation Officer, as noted above.

13 Whether these should be counted as obstruction, or as additional evidence that WRIGHT

14 has flunked accepting responsibility, is up to the Court.  The government believes they

15 can, and should, be considered as both.

16 In addition to the bogus MM letter, the silly denials to Probation, and on top of

17 bringing false charges and claims against CJ Jackson (a flagrant obstructive act, meant to

18 deflect blame regarding a criminal investigation by the Army National Guard and the

19 consequences thereof), WRIGHT has made false statements to GSA, VBA, SSA and

20 others about the facts in this case.  WRIGHT made the false statements to retain or

21 continue his government benefits.  Once WRIGHT pled guilty, any false information he

22 submitted to agencies who suffered loss would qualify as obstructive behavior, *i.e.*,

23 attempting to influence the sentencing court's calculation of loss.  Although entitled to

24 due process, WRIGHT is not entitled to mislead, to deceive, and to lie.

25

26

27

28

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 26

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  DATED this 26th day of May, 2017.

2                                                 Respectfully submitted,

3

4                                                 ANNETTE L. HAYES
                                               United States Attorney

5

6                                            *s/  David Reese Jennings*
                                           DAVID REESE JENNINGS

7

8                                            *s/  Gregory A. Gruber*
                                          GREGORY A. GRUBER

9                                            Assistant United States Attorney
                                          United States Attorney's Office

10                                            1201 Pacific Avenue, Suite 700
                                          Tacoma, WA  98402

11                                            Telephone:    (253) 428-3817
                                          Fax:             (253) 428-3826

12

13                                            E-mail:  David.R.Jennings@usdoj.gov
                                          E-mail:  Gregory.A.Gruber@usdoj.gov

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 27

1    CERTIFICATE OF SERVICE

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

US v. DARRYL LEE WRIGHT/CR14-5539BHS
GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM - 28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800