The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>DARRYL WRIGHT,<br><br>        Defendant. | No. CR14-5539 BHS<br><br>DEFENDANT'S SUPPLEMENTAL<br>SENTENCING MEMORANDUM |

Defendant Darryl Wright, by his attorney, Christopher Black, submits the following supplemental memorandum regarding the calculation of restitution and the outstanding sentencing guideline determinations[1] in this case.

## I.    <u>Introduction</u>

Darryl Wright is a complicated individual and this case presents complicated questions about how to evaluate various aspects of his personal history, physical and mental health conditions, and conduct, in determining the appropriate sentence in this matter. Likewise, the fact that this case implicates alleged losses from multiple different agencies, all with different

---

[1] The defense acknowledges that the Court has already made a number of sentencing guideline determinations. To the extent that the Court's prior decisions on guideline issues were counter to previous defense arguments, the defense maintains its objections but will not re-address those issues in this brief.

DEFENDANT'S SUPPLEMENTAL SENTENCING
MEMORANDUM
(*Darryl Wright*; No. CR14-5539 BHS) - 1

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA 98104
206.623.1604 | Fax: 206.658.2401

rules, regulations, and dispute resolution systems, renders the decision even more complex. While the Government has taken the position that Mr. Wright has no disabilities at all, and has framed the case as a multitude of frauds that are based on Mr. Wright's discredited account about a rocket attack, thereby establishing that all of the benefits Mr. Wright has received are ill-gotten gains, the facts introduced at the evidentiary hearings in this matter show that this is not the case. In actuality, a close examination of Mr. Wright's statements, both those that have been shown to be untrue and not, in the context of the actual decision-making processes of the various agencies, show that the vast majority of Mr. Wright's untrue statements were not material to the agencies' decisions to grant him benefits or other consideration.

## II. Calculation of Restitution and Loss Amount Under U.S.S.G. § 2B1.1

Calculation of restitution and the loss amount under the sentencing guidelines are related but distinct inquiries.

### A. Applicable Legal Standards

The Mandatory Victims Restitution Act, 18 U.S.C. § 3663A (MVRA) sets forth applicable standards for the calculation of restitution in this case. The MVRA limits restitution to those losses that "directly result" from and are "proximately" caused by the defendant's offense. 18 U.S.C. § 3663A(a)(2). Under the MVRA, restitution may compensate victims only "for actual losses caused by the defendant's criminal conduct." United States v. Gamma Tech Indus., Inc., 265 F.3d 917, 926 (9th Cir.2001). A "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). The government has the burden of proving this causal connection between the victim's loss and the defendant's offense by a preponderance of the evidence. United States v. Rice, 38 F.3d 1536, 1540 (9th Cir. 1994).

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA 98104
206.623.1604 | Fax: 206.658.2401

While there is obviously significant overlap between the calculation of restitution and the calculation of loss amount under the sentencing guidelines, there are also important differences. First is that when it comes to calculating a loss amount, the Court need only make a "reasonable estimate of the loss." U.S.S.G. § 2B1.1, Application Note 3(C). The Court is not limited in the factors it can consider when arriving at such an estimate. See id.

The second significant difference between calculating restitution and calculating the loss amount, at least under the circumstances of this case, is the difference in the Government's burden of proof. As set forth in Mr. Wright's initial memorandum regarding the calculation of the sentencing guidelines (dkt. 194), because the combined impact of contested sentencing enhancements is disproportionate relative to the offense of conviction, the Court must apply the clear and convincing evidence standard of proof when calculating the loss amount in this case. United States v. Valensia, 222 F.3d 1173, 1182 (9th Cir. 2000). This analysis is set forth in Mr. Wright's prior U.S.S.G. memorandum, at Dkt. 194, p. 4-6. Because none of the facts underlying the analysis have changed in any material way, the analysis will not be repeated here.

B.   Calculations

This memorandum will address the defense's proposed restitution and guideline loss amount figures on an agency by agency basis.

1.   **Veterans Benefits Administration**

The defense maintains its position that the VA disability benefits that Mr. Wright received should not be counted as losses under the sentencing guidelines, or included in a restitution order, on the basis that Mr. Wright met all of the medical criteria for the ratings he received through the VA at the time they were received, despite his admitted fraud. While the

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA 98104
206.623.1604 | Fax: 206.658.2401

Court has already indicated its leaning in regard to how it is likely to rule with respect to the VBA payments, the defense will endeavor to point out some reasons why the Court should not follow its proposed course, or at least not follow it completely.

The Court heard extensive testimony and has reviewed extensive records about the VA benefits Mr. Wright received, the history of how those benefits were awarded, and the evidence supporting the benefit awards. Summed up, the VA has taken the position that Mr. Wright remains eligible for benefits at the 30% disability level, based on the following ratings he received in a decision issued on January 19, 2007: right shoulder strain 10%, low back strain 10% and tinnitus 10%, all effective November 22, 2005. The VA reasons that Mr. Wright remains eligible for these benefits because they were awarded prior to Mr. Wright providing an account about a rocket attack that occurred in August, 2005, which led to Mr. Wright's receipt of the Combat Action Badge ("CAB"), and which has been discredited. The VA severed all other benefits, including those for later-diagnosed conditions and those for subsequently increased ratings for the original three conditions, on the averred basis that all subsequent awards were premised on the discredited account of the rocket attack.

The Court should not defer to the VA's decision to sever all of Mr. Wright's benefits beyond the original three ratings because the alleged basis on which the VA made its decision is not supported by the record. In particular, it is clear that the VA did not make the decision to award those subsequent benefits to Mr. Wright on the basis of Mr. Wright's receipt of the CAB and account of the 2005 rocket attack. We know this because Mr. Wright provided that information to the VA in 2007, subsequent to his initial award, and was still denied any increased award of benefits. See Ex. 71.022-027 (VA Rating Decision dated June 13, 2007) and Ex. 71.050-052 (VA Rating Decision dated August 14, 2007). Mr. Wright provided the VA

DEFENDANT'S SUPPLEMENTAL SENTENCING
MEMORANDUM
(*Darryl Wright*; No. CR14-5539 BHS) - 4

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA 98104
206.623.1604 | Fax: 206.658.2401

evidence of the CAB as well as an account of his various injuries, which the VA found unpersuasive.  See Ex. 71.050-052.  It is difficult to understand how the VA can then take the position that all of the subsequent ratings decisions were dependent on the rocket attack account.

It appears that the subsequent ratings decisions were in actuality based on medical evaluations and testing, in particular, regarding TBI/PTSD, the evaluations performed by Dr. Warner and the neuropsychological testing performed by Dr. Pagulayan between late 2007 and 2009. See Ex. 71.077-084 (July 7, 2008 VA Rating Decision) and Dkt. 196-4, at 16-56 (VA medical records).  These doctors diagnosed Mr. Wright with PTSD and TBI on the bases of evaluations and testing.  Mr. Wright provided accounts of five separate incidents leading to injury, only one of which has been called into question (the rocket attack). Dkt. 196-4, at 16-17. Given the sum of the evaluations and testing, and the fact that the VA had already rejected a claim after Mr. Wright had reported his receipt of the CAB and the rocket attack, it would be difficult to find that the rocket attack account was material to the VA evaluations.

This conclusion is supported by the fact that Mr. Wright's mental health diagnoses have been recently confirmed by both Dr. Salusky and, more importantly, Dr. Muscatel.  Dr. Muscatel's evaluation is more important because Dr. Muscatel was a neutral evaluator, agreed upon by the parties, who was provided all relevant materials by both parties, and was fully informed of all relevant facts.  Dr. Muscatel is a well-respected forensic psychologist who regularly works for both the prosecution, including the United States Attorney's Office, and the defense.  Part of the reason Dr. Muscatel's evaluation in this case was delayed was his involvement as the state's expert in the Seattle Pacific University shooting case.  Dr. Muscatel

DEFENDANT'S SUPPLEMENTAL SENTENCING
MEMORANDUM
(*Darryl Wright*; No. CR14-5539 BHS) - 5

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA  98104
206.623.1604 | Fax:  206.658.2401

has been performing forensic psychological work for decades.  He is being paid by the Court.  In short, both Dr. Muscatel's credentials and lack of bias are unimpeachable.

Dr. Muscatel conducted a comprehensive evaluation in this case, including review of all the relevant records provided by the parties, interviewing Mr. Wright on three separate occasions, including once in the presence of government and defense counsel, and conducting psychological testing.  He provided Mr. Wright with the following diagnoses from the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5"):

- Unspecified Depressive Disorder
- Unspecified Anxiety Disorder
- Posttraumatic Stress Disorder, Mild to Moderate, Chronic
- Alcohol Abuse/Dependence, In Reported Remission
- Unspecified Personality Disorder, with Antisocial, Narcissistic, and Histrionic Features

Muscatel Report, Dkt. 229 at 35.  Dr. Muscatel based these diagnoses on findings that Mr. Wright was suffering from depression and PTSD.  "After reviewing the medical records and my own psychological testing, it is apparent that Mr. Wright was depressed and probably was suffering posttraumatic stress disorder as well." Id. at 30.  "The mental health providers and examiners likely did rightly identify posttraumatic stress, depressive disorder/mood disorder, and substance abuse problems as real and verifiable concerns." Id. at 33.

Dr. Muscatel's report included an extensive discussion of Mr. Wright's underlying personality traits, which Dr. Muscatel acknowledged predated Mr. Wright's service in Iraq and contributed significantly to Mr. Wright's criminal actions.  Dr. Muscatel also described these traits may have led to Mr. Wright at times exaggerating his symptoms and also to justifying his actions to himself.  However, and importantly, Dr. Muscatel did not find that Mr. Wright had symptoms because he believed he had symptoms.  Rather, Dr. Muscatel found that Mr. Wright had depression and PTSD **despite** all the other factors.  The defense respectfully submits that

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA  98104
206.623.1604 | Fax:  206.658.2401

the fact that Dr. Muscatel included the extensive discussion of Mr. Wright's personality disorders and how they impacted his thinking supports, rather than detracts, from his conclusions. The discussion demonstrates that Dr. Muscatel considered all the relevant factors, positive and negative, when arriving at his conclusion.

Dr. Muscatel also clearly found that Mr. Wright's service in Iraq negatively impacted his mental health. "He likely did have components of posttraumatic stress and depression and utilized alcohol, both to cope with some of those feelings, but also to exercise external control on his underlying disturbance of personality and behavior that were of longstanding and not directly associated with the effects of his service in Iraq. The time in Iraq likely did destabilize elements of his personality, which were under better control, prior to his service in the military, however. There was no evidence that I saw suggesting that he was engaged in clearly criminal or under socialized behavior, although the seeds of poor anger control, inappropriate behavior, and substance abuse were present, prior to his time in Iraq." Id. at 31-32. "The only area that I find myself in some agreement with Dr. Salusky in his evaluation was the fact that Mr. Wright's life did suffer some distortion and some injury from his service in Iraq, and that his features of histrionic and other distortions in personality caused his reaction to those injuries to be greater and clearly more inappropriate than was apparent in his cohort of service personnel, who also experienced posttraumatic stress symptoms in Iraq." Id. at 33.

Dr. Phillips's testimony echoed that of Dr. Muscatel. Dr. Phillips has been Mr. Wright's therapist for about five years. He has been seeing Mr. Wright on a bi-weekly basis essentially that entire time. Like Dr. Muscatel, Dr. Phillips acknowledged Mr. Wright's personality issues, but also found that Mr. Wright suffers from PTSD associated with his service in Iraq. While Dr. Phillips is clearly not just an impartial observer, he is also not someone who has a personal

DEFENDANT'S SUPPLEMENTAL SENTENCING
MEMORANDUM
(*Darryl Wright*; No. CR14-5539 BHS) - 7

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA 98104
206.623.1604 | Fax: 206.658.2401

stake in the outcome of this case or someone who would likely testify untruthfully. He has quite extensive experience working with veterans, and is someone who knows Mr. Wright very well. It strains credulity to think that someone with his level of training and experience would be unable to detect a put-on or would voluntarily participate in a sham for five years, a point further supported by the fact given that Mr. Wright has nothing to gain from this therapy other than trying to improve himself.

Another way to demonstrate that the VA's methodology for severing Mr. Wright's benefits is faulty is to focus on the ratings that they did not sever, to wit: right shoulder strain 10%, low back strain 10% and tinnitus 10%, all effective November 22, 2005. Again, the VA maintained these ratings because they were awarded prior to Mr. Wright providing an account about the rocket attack. The VA later increased the ratings for right shoulder strain and low back strain. On July 7, 2008, low back strain was upgraded to low back strain with invertebral disc syndrome, with a rating of 20%, effective June 19, 2008, and right shoulder strain was increased to 20%, both effective November 22, 2005. See Ex. 71.077-84. On April 4, 2014, the VA upgraded low back strain with invertebral disc syndrome to lumbosacral spine degenerative disc disease, with a rating of 40%, effective April 17, 2013. See Ex. 14.018-037.

The upgraded ratings were based in their entirety on medical testing showing that the symptoms of the injuries had worsened. The ratings decisions do not describe any basis for increase other than changes in test results that meet certain benchmarks for upgrades. Because the VA did not sever the ratings for the underlying conditions, it is difficult to understand the basis on which it reduced the ratings. In other words, if the VA concluded that the initial rating was incorrect because of fraudulent reporting, or any other reason, it would make sense to sever

DEFENDANT'S SUPPLEMENTAL SENTENCING
MEMORANDUM
(*Darryl Wright*; No. CR14-5539 BHS) - 8

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA 98104
206.623.1604 | Fax: 206.658.2401

the rating altogether.  What does not make sense is how the rating can simply be reduced, when the increased percentage is based only on testing as to severity.

A similar analysis applies to Mr. Wright's rating for an elbow injury.  On June 19, 2008, Mr. Wright received a 10% rating for right elbow strain, effective November 22, 2005.  It is hard to see how the discrediting of the rocket attack account led to the severance of this rating. The rating was based on medical testing.  <u>See</u> Ex. 71.077-84.  What could be the basis for leaving rating for back and shoulder strain in place, but finding that the rating for elbow strain was tied to the rocket attack?  Along these same lines, on April 25, 2014, Mr. Wright received a rating for erectile dysfunction. Ex. 14.023.  Counsel is at a loss to figure out how this rating was related to the rocket attack account.

If the Court were to exclude these reductions from the restitution and/or guideline loss amount calculations, the relevant figure would decrease from approximately $261,000 to approximately $127,000.  This best approximates and account for the changing rating percentages by the VA over time, as well as the compensation amount for the specific years (including COLAs), and adjustments on the status of Mr. Wright's dependents and spouse.  This figure does *not* account for approximately $59,192 the VA has already authorized for Mr. Wright regarding the combined 30% award since November 2005.

Finally, should the Court decide to defer to the agency determination that the payments should not have issued and include the payments in full in the restitution order, the defense submits that the Court should nonetheless find a lower loss amount on the basis that Mr. Wright has appealed the agency determination and has a fair chance of prevailing.  Essentially, the defense is requesting that the Court multiply the amount of benefits paid by the Court's estimation of the approximate chance that Mr. Wright may prevail on appeal in coming to a

DEFENDANT'S SUPPLEMENTAL SENTENCING
MEMORANDUM
(*Darryl Wright*; No. CR14-5539 BHS) - 9

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA  98104
206.623.1604 | Fax:  206.658.2401

reasonable estimate of the loss amount. <u>See</u> U.S.S.G. § 2B1.1, Application Note 3(C). Alternatively, the defense requests that the Court consider a downward departure, based on similar reasoning, as to the VA payments or to the various payments from administrative agencies collectively. As counsel previously noted, the restitution order is subject to future modification if Mr. Wright prevails in an administrative appeal, but the guideline loss amount and sentence cannot be.

### 2. VA Caregiver Program

It is appropriate for the Court to adopt a portion of the total payments from the Caregiver Program to Karen Wright as a reasonable estimate for both restitution and loss amount for Mr. Wright because there were no real standards against which to measure the materiality of any false statements by Mr. Wright. Tara Stablein from the VA Caregiver program testified that at the time Mr. Wright became involved with the program, it was in its infancy, and lacked clear standards for who qualified, how they qualified, and what care they needed. She noted that providers needed to make assessments but they had "cart blanche" in so doing. The final rule setting these standards was not published until 2015. Ms. Stablein acknowledged that the program was not one size fits all and that it had no hard and fast rules, at least initially.

Given all the uncertainty surrounding the program at the time Mr. Wright was participating in it, it is unclear to what extent any misrepresentations he made impacted either his eligibility to participate in the program or the extent of the benefits for which he qualified. As described above, Mr. Wright has long been diagnosed with PTSD and depression, which are both injuries that qualified him for the caregiver program. Dr. Boyko evaluated Mr. Wright for the program and found that he qualified. Mr. Wright was forthcoming with his doctors at the VA regarding his activities of daily life, including volunteering, playing and coaching

DEFENDANT'S SUPPLEMENTAL SENTENCING
MEMORANDUM
(*Darryl Wright*; No. CR14-5539 BHS) - 10

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA 98104
206.623.1604 | Fax: 206.658.2401

basketball, and travelling to Idaho.  Karen Wright provided care, although not as much as reported.

Taking all the facts into consideration, the defense proposes that the Court adopt a restitution and USSG loss amount of $20,000 pertaining to the VA Caregiver Program.  The starting point for this calculation is the $40,000 figure that the Court established as a restitution figure for Mr. Wright's co-defendant, Karen Wright.  That figure presumably represents a finding that Ms. Wright performed roughly half of her duties as Mr. Wright's caregiver; i.e. she failed to perform $40,000 worth of work.  The reason that the defense suggests a figure of $20,000 is that Mr. Wright had other people assisting in his care who were listed as secondary caregivers and who made up for a substantial portion of the assistance that Ms. Wright was not providing.  These caregivers included Chuck Wright, Elaine Spalding, and Heather Munden. The secondary caregivers, particularly Ms. Munden, provided a significant amount of assistance to Mr. Wright during the time he was in the program, including the same type of assistance that Ms. Wright provided.  Our figure of $20,000 represents an estimate that the secondary caregivers provided half of the support that Ms. Wright failed to provide.

### 3.  Social Security Administration

The defense persists in its position that the Social Security disability benefits that Mr. Wright received should not be counted as losses under the sentencing guidelines or included in a restitution order, on the basis that Mr. Wright met all of the criteria for Social Security disability through the Social Security Administration (SSA) when he applied and was ultimately approved on April 10, 2010, and that Mr. Wright continued to be medically and otherwise eligible for these benefits until his benefits were ceased by SSA in February of 2015.

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA  98104
206.623.1604 | Fax:  206.658.2401

To be eligible for disability benefits under the Social Security Administration a claimant must meet the following criteria: 1) have worked long enough to have obtained sufficient quarters of coverage for benefits (standard rule is has worked 5 out of the last 10 years at a full-time basis); 2) have a medically determinable severe impairment or combination of impairments, 3) not be working or earning substantial gainful activity if working; 4) has not worked at least 12 consecutive months or is expected to be unable to work for 12 consecutive months due to medical conditions; and 5) is unable to perform past work or any other work in the national economy that exists in significant numbers. 20 CFR § 404.1505, Sec. 404.1509.

Mr. Wright applied for Social Security disability benefits on February 8, 2010. Exhibit ("Ex.") A13. In that application he alleged that he had been disabled since February 18, 2009, due to combination of impairments including: post-traumatic stress disorder, depressive and cognitive disorders, traumatic brain injury, asthma, bruxism, migraines, chronic pain, right arm, lower back, bilateral feet/ankle conditions, tinnitus, endocrine system and skin conditions, GERD, sleep apnea, alcohol abuse, irritable colon condition, intervertebral disc syndrome, and ulnar neuropathy. <u>Id</u>. at 3. In his application he included that he was a Gulf era veteran with a 90% rating for service connected disabilities through the VA as of January 15, 2010. <u>Id</u>. He also informed SSA on his application requesting benefits that he was employed and drawing a salary in 2009, and would continue to be employed in 2010, estimating his earnings to be $70,000 each year. <u>Id</u>. at 2.

The SSA awarded Mr. Wright benefits on the basis of its medical evaluation of Mr. Wright. An SSA psychologist, Eugene Kester, MD., performed this evaluation. On March 24, 2010, Dr. Kester found that Mr. Wright suffered from cognitive disorder, depressive disorder, PTSD chronic, and alcohol abuse in remission. Ex. A14. The evaluation was based in large

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA 98104
206.623.1604 | Fax: 206.658.2401

degree on a review of Mr. Wright's VA medical records, with specific emphasis on Mr. Wright's recent neuropsychological testing. Id. at 13. There is no indication that Dr. Kester placed any significance on the rocket attack account, or that he even knew about it. See id. Dr. Kester found that Mr. Wright was disabled based solely on his "markedly limited" ability "to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." Ex. A15 at 2. The SSA did not perform any other medical testing or make any other medical findings regarding Mr. Wright.

At the request of SSA and as part of the initial application process Mr. Wright submitted an Adult Function Report dated April 5, 2010. Ex. 5 at .039-046. The report was signed by Darryl Wright. In that report, he indicated he was still working, but he had exhausted his sick pay and it was becoming too difficult for him to perform work competitively. There is no evidence in the record establishing that this function report, or any of the statements therein, were material to the SSA's decision to award Mr. Wright disability payments on the basis of his being unable to maintain a normal work schedule due to his psychological symptoms. On April 10, 2010, Mr. Wright was awarded Social Security disability benefits. Ex. A16.

The SSA began a Continuing Disability Review (CDR) of Mr. Wright's case in April 13, 2012. The subject of the review was twofold. First, SSA reviewed medical evidence to determine whether Mr. Wright was still medically eligible for disability benefits. Second, Mr. Wright had continued to work after he was found disabled and posted earnings at above what SSA calls substantial gainful activity (SGA) in 2010, 2011 and had earnings in 2012.[2] SSA

---

[2] Mr. Wright did not conceal the fact he continued to work in 2010, 2011 and into 2012 after having been approved for disability benefits. He informed SSA he was working in his initial application and

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA 98104
206.623.1604 | Fax: 206.658.2401

reviewed his case to determine whether Mr. Wright owed an overpayment due to his continued employment.

The SSA decided the two issues separately. On December 6, 2012, SSA psychologist Carla van Dam, Ph.D. found that Mr. Wright had not improved medically since March 2010. See Ex. A17, A18. This decision appears to have been based both on Dr. Van Dam's evaluation of Mr. Wright and her review of relevant records. Id. There is no indication that Dr. Van Dam relied on any material false statements in coming to her conclusion. Dr. van Dam specifically noted she did not see medical improvement of Mr. Wright's mental condition since March of 2010. Ex. A18.

On July 25, 2014, the SSA concluded the work performed by Mr. Wright in 2010, 2011 and 2012 was not considered substantial gainful activity (SGA). Ex. A21. Substantial gainful activity is defined as work done for pay or profit. SSR 83-33. The SSA will find a claimant has engaged in work that is substantial gainful activity when the claimant has earned a specific amount over a duration of time. In 2010 and in 2011, SSA deemed $1,000/month gross income was substantial gainful activity. In 2012 SSA deemed $1010/month in gross earnings to be substantial gainful activity.[3] If a claimant worked and earned the established substantial gainful activity amounts for 6 or more continuous months, then by definition a person cannot also be found disabled under SSA unless an exception exists. 20 CFR § 404.1573.

One exception to the SGA rule is where a claimant performs work under special conditions. Specifically, the SSA will consider whether the claimant worked irregular hours or took frequent rest periods, was able to work only due to special arrangements or was permitted

SSA increased his monthly cash benefit in 2011 and 2012 to reflect his continued earnings in 2010, 2011, and 2012.

[3] https://www.ssa.gov/oact/cola/sga.html

DEFENDANT'S SUPPLEMENTAL SENTENCING
MEMORANDUM
(*Darryl Wright*; No. CR14-5539 BHS) - 14

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA 98104
206.623.1604 | Fax: 206.658.2401

to work at a lower standard of productivity or efficiency than other employees.  20 CFR § 404.1573 (c)(1)-(6).

On January 16, 2014, at the request of the SSA, Mr. Wright completed a form where he explained the basis of gross wages he earned between September, 2008 and July, 2012. Ex. A20.  On this form, he informed SSA he worked as an Economic Development Specialist (EDS) during this period. Id. at 2.  He further explained that he worked irregular hours or fewer work hours than others, took more rest periods than others, had fewer or easier duties than others, was allowed to produce less work than others and had an in-home care attendant with help regarding work transition. Id. at 4-5.  Notably, these assertions were confirmed by the testimony of Richard Manwaring, Mr. Wright's supervisor at the Department of Commerce, who testified that a wide range of accommodations were made for Mr. Wright, who nonetheless failed to produce any substantial work product despite still being paid a salary.

On this form Mr. Wright also reported he had a caregiver cost of $3,000/month and incurred an $875/month specialty transportation expense. Id. at 6.  Mr. Wright submitted fraudulent invoices to support these assertions.  These facts relate to another method by which the SSA can adjust earned income, which is by subtracting Impairment-Related Work Expenses (IRWEs) that were paid by the claimant in order to be able to work.  SSA POMS DI 10520.001. One example of an IRWE is payments made to a caregiver who is needed by the claimant in order for him/her to sustain work.  If a claimant needs a caregiver to sustain employment, then SSA can subtract the cost of the caregiver from his/her gross earnings when considering whether he/she worked at the SGA level.

On July 25, 2014, the SSA concluded that Mr. Wright's work as an EDS was not performed at the substantial gainful activity level, which means he was entitled to benefits even

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA  98104
206.623.1604 | Fax:  206.658.2401

though he had continued to work in 2010, 2011 and a portion of 2012. Ex. A21. The SSA did not set forth the basis for its finding that Mr. Wright did not perform work at SGA level. Id. However, it is clear that the work performed by Mr. Wright from January of 2009 until July of 2012 easily fits the definition of a special workplace accommodation. Mr. Wright was working from home and was not performing work at a competitive pace nor was he producing work on a competitive basis. Given the fact that Mr. Wright was clearly not performing work at SGA level, and was eligible for disability benefits despite working, on that basis alone, the fact that he also submitted fraudulent caregiver invoices in an attempt to justify those payments cannot be material to the question of whether the disability payments from the SSA to Mr. Wright should be counted as loss amounts or included in a restitution order.

Based on the foregoing, the defense submits that the Government has not met its burden of establishing by a preponderance of the evidence that the SSA payments should be counted towards restitution and certainly has not established by clear and convincing evidence that the payments should be counted as losses under U.S.S.G. § 2B1.1. As with the VA benefit payments, should the Court decide to defer to the agency determination for the purposes of restitution, the defense submits that the Court should nonetheless find a lower loss amount on the basis that Mr. Wright has a fair chance of prevailing on appeal. This would take the form of either a reasonable estimate of the loss amount or a downward departure. Again, while the restitution order is subject to future modification, but the guideline loss amount and sentence is not.

### 4. Department of Commerce

The Court should not count the alleged losses from the Department of Commerce ("DOC") in Wright in the restitution order or count them as losses under U.S.S.G. § 2B1.1. The

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA 98104
206.623.1604 | Fax: 206.658.2401

Government has taken the position that Mr. Wright should be held accountable for all of the salary he received subsequent to his submission of false military orders because he would have been immediately fired but for other alleged fraudulent conduct related to his employment, namely the filing of false complaints related to his disabilities and employment. Government Sentencing Memorandum, Dkt. # 193 at 7-8.

There are a multitude of problems with the Government's theory. First is that salary is something given in exchange for work. While there were certainly issues with the quality and quantity of the work performed by Mr. Wright, those deficiencies were apparent to the DOC at the time Mr. Wright was employed. A decision to pay someone a salary despite known deficiencies with his or her work product does not constitute fraud. The second problem with the Government's theory is that the Government presented no evidence of the content of Mr. Wright's alleged false complaints. While Mr. Wright did eventually enter a settlement agreement with the DOC relating to workplace complaints that he had made, without knowing the content of the complaints that led to the settlement, it is impossible for the Court to even consider whether they were fraudulent. The final problem with the Government's theory is that the record does not support the Government's blanket assertion that Mr. Wright would have been fired upon the discovery of the false orders but for his subsequent conduct. Instead, as Mr. Manwaring testified, Mr. Manwaring was the first person at the DOC to recommend Mr. Wright's termination, did he not submit this recommendation until January of 2012, just a few months prior to Mr. Wright's resignation in July, 2012. As such, the claim that Mr. Wright would have been fired in 2009 is baseless.

DEFENDANT'S SUPPLEMENTAL SENTENCING MEMORANDUM
(*Darryl Wright*; No. CR14-5539 BHS) - 17

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA 98104
206.623.1604 | Fax: 206.658.2401

Because the record does not support the Government's argument, the Court should not include Mr. Wright's salary from the DOC in the restitution order or count it as loss under the sentencing guidelines.

**5. Office of Personnel Management**

The Court should not include the payments from the Office of Personnel Management ("OPM") to Mr. Wright in the restitution order or count them as losses under U.S.S.G. § 2B1.1. Mr. Wright submitted an application for retirement benefits that included a disability statement that noted a number of disabilities and injuries, including PTSD and depression, among others. See Ex. 7.007. The statement includes both combat-related conditions and injuries that post-date Mr. Wright's deployment (an automobile accident and assault). The statement is relatively short. In it Mr. Wright describes his difficulties at work, but not in great detail. Mr. Wright certainly does not reference the rocket attack in any manner.

OPM granted Mr. Wright disability retirement "due to post-traumatic stress disorder and depression, only." Ex. 7.021 (September 6, 2012 letter from OPM to Darryl Wright). As described in detail above, Mr. Wright had current diagnoses for PTSD and depression at the time, and those diagnoses have recently been reaffirmed by multiple doctors. OPM does not have a requirement that the relevant conditions be related to military service, so the source of Mr. Wright's conditions is not relevant to the analysis.

The Government has taken the position that Mr. Wright should be found ineligible for the retirement benefits he received on the basis that, had he been "fired from the Department of Commerce for fraud, he would have to show that his medical condition caused him to commit fraud in order for him to be eligible for OPM disability benefits." Ex. 2.002 (Declaration of Eva

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA 98104
206.623.1604 | Fax: 206.658.2401

Ukkola).  On cross-examination at the hearing, Ms. Ukkola testified that her analysis is based on requirements set forth in 5 C.F.R. 844.

There are two significant problems with the Government's theory.  First is that Mr. Wright was never fired from the Department of Commerce.  Second is that Ms. Ukkola's interpretation of the relevant C.F.R. provision does not appear to be correct.  Counsel's review of that chapter uncovered no such requirement.  The most relevant section in the chapter provides:

> OPM may rescind a decision to allow an application for disability retirement at any time if OPM determines that the original decision was erroneous due to fraud, misstatement of fact, or upon the acquisition of additional medical or other documentation.

5 C.F.R. 844.203(c)(2).  This provision says nothing more than that OPM may rescind a decision to award disability retirement upon a showing of fraud that was material to the decision to grant the award in the first place.  This is of course far different than the statement contained in Ms. Ukkola's declaration.

There has not been a showing that Mr. Wright made material misstatements in his application for disability retirement.  As such, the Court should not award restitution to OPM or include the award in the guideline loss amount.

### 6.  Washington State Employment Security

The defense does not have additional argument to present regarding the unemployment payments received by Mr. Wright.

### 7.  Department of Education

The defense objects to the inclusion of these alleged losses as restitution or losses for guideline purposes.  While Mr. Wright applied for loan forgiveness under the prong of the test relating to establishment of a 100% disability rating by the VA, there are a number of ways one

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA  98104
206.623.1604 | Fax:  206.658.2401

can establish total and permanent disability. As Chris Odom from the Department of Education testified, one of these means is for the applicant to submit certification from a physician that the applicant is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that:

- Can be expected to result in death;

- Has lasted for a continuous period of not less than 60 months; or

- Can be expected to last for a continuous period of not less than 60 months.

Mr. Odom testified that inability to "engage in any substantial gainful activity" consists of inability to earn an amount above the federal poverty guidelines.[4] In other words, under this prong a person need not be completely unable to work or function, just below a certain threshold. It is virtually certain that Mr. Wright met this threshold at the time of his application. Mr. Wright has not been able to work since 2012, based on mental impairments, as described above. As such, it is virtually certain that Mr. Wright would have qualified for loan forgiveness under an alternate prong of the test. The Court should not include his forgiven loan in the restitution order or as guideline loss amount.

### III.  Other U.S.S.G. Issues

### A. Obstruction of Justice (U.S.S.G. § 3C1.1)

It is unclear to the defense whether the Government will persist in seeking an enhancement for obstruction of justice, and if so, on what basis. The defense maintains the arguments previously set forth pertaining to Mr. Wright's conduct while on pretrial release. See Dkt. # 194 at 15. As to the allegations regarding MWM's letter to the Court, it seems clear

---

[4] Counsel provides this definition with the proviso that it reflects Mr. Odom's testimony to the best of his recollection. Counsel apologizes for any potential error of memory, and defers to the court reporter's record.

DEFENDANT'S SUPPLEMENTAL SENTENCING
MEMORANDUM
(*Darryl Wright*; No. CR14-5539 BHS) - 20

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA 98104
206.623.1604 | Fax: 206.658.2401

from USPO Acker's report, Dkt. # 213, that the facts do not support an obstruction enhancement for Mr. Wright. Should the Government propose an enhancement based on other alleged facts, the defense may need to submit a further response.

**B. Acceptance of Responsibility (U.S.S.G. § 3E1.1)**

It is similarly unclear whether the Government will persist in arguing that Mr. Wright should not receive a reduction in his offense level for accepting responsibility. From a conversation with AUSA Jennings, the defense understands that the Government will take the position that if the Court awards a two-level reduction and the offense level is 16 or higher, the Government will move for the third level. In other words, any dispute will pertain only to whether Mr. Wright receives the reduction at all, not about how much of a reduction it will be.

The defense maintains all of its prior arguments regarding acceptance of responsibility. See Dkt. # 194 at 16. Should the Government introduce additional arguments, the defense may need to submit a further response.

DATED this 26[h] day of May, 2017.

Respectfully submitted,

BLACK LAW, PLLC


s/ Christopher Black
Christopher Black
Attorney for Darryl Wright
Black Law, PLLC
1111 Hoge Building
705 Second Avenue
Seattle, WA 98104
Phone:        206.623.1604
Fax:           206.658.2401
Email:        chris@blacklawseattle.com

DEFENDANT'S SUPPLEMENTAL SENTENCING
MEMORANDUM
(*Darryl Wright*; No. CR14-5539 BHS) - 21

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA 98104
206.623.1604 | Fax: 206.658.2401

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served on the below-noted date, via the CM/ECF system, upon the parties required to be served in this action.

DATED this 26<sup>h</sup> day of May, 2017.

<div style="margin-left: 40%">

Respectfully submitted,

BLACK LAW, PLLC


<u>s/ Christopher Black</u>
Christopher Black
Attorney for Darryl Wright
Black Law, PLLC
1111 Hoge Building
705 Second Avenue
Seattle, WA  98104
Phone:          206.623.1604
Fax:             206.658.2401
Email:          chris@blacklawseattle.com

</div>

DEFENDANT'S SUPPLEMENTAL SENTENCING
MEMORANDUM
(*Darryl Wright*; No. CR14-5539 BHS) - 22

BLACK LAW, PLLC
1111 Hoge Building, 705 Second Avenue
Seattle, WA  98104
206.623.1604 | Fax:  206.658.2401